**Jhonny A. HUAMAN–CORNELIO, Petitioner,**

v.

**BOARD OF IMMIGRATION APPEALS, Respondent.**

No. 92–1201.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1992.

Decided Nov. 19, 1992.

Rex B. Wingerter, Washington, D.C., for petitioner.

Norah Ascoli Schwarz, U.S. Dept. of Justice, Washington, D.C., (Stuart M. Gerson, Atty. Gen., David J. Kline, Asst. Director, Office of Immigration Litigation, Charles E. Hamilton, III, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., on brief), for respondent.

Before WILKINSON, NIEMEYER, and LUTTIG, Circuit Judges.

OPINION

WILKINSON, Circuit Judge:

Petitioner in this case contests the denial of his application for asylum by the Board of Immigration Appeals ("BIA"). The immigration judge ("IJ") had ruled in petitioner's favor on the asylum claim, and petitioner contends chiefly that subsequent panels of review must pay that initial ruling substantial deference. We think, however, that petitioner would accord more weight to the IJ's finding than the law compels or even allows. Applying the proper standard of review to petitioner's claims, we affirm the BIA's decision that he was statutorily ineligible for asylum.

I.

Petitioner Jhonny Huaman–Cornelio ("Huaman") is a citizen of Peru. In 1987, Border Patrol agents twice caught him entering the United States illegally from Mexico. The first time, Huaman convinced the agents he was Mexican, and they al-lowed him to return to Mexico. The second time, he filed a request for asylum and withholding of deportation.

While in Peru, petitioner was an engineering student and a member of an underground political opposition party, the Movimiento Revolucionario Tupac Amaru ("MRTA"), from 1983 to 1987. According to Huaman, MRTA functioned primarily as a nonviolent, propaganda-spreading organization during the early years of his involvement. MRTA did, however, extort money, food, and goods from stores and factories for distribution to the poor. It also organized strikes and demonstrations.

From 1983 to 1985, petitioner gained influence in MRTA. He became privy to confidential MRTA membership lists and secret meeting places around Peru's National University of Engineering (the "University"). As an MRTA leader, Huaman received false identification papers that made it more difficult to link him with MRTA. In 1984, Peruvian police arrested him at a demonstration, but later released him. While in custody, Huaman showed the authorities only his false identification papers, and the government did not discover his true identity or his connection with MRTA.

In 1985 and early 1986, MRTA came under the influence of Shining Path, a Maoist, terrorist group well-known for its violent tendencies. As MRTA's tactics turned toward bombing buildings and killing people, Huaman claimed his personal ideology would not let him participate in violence that destroyed the people he sought to help. Although afraid to abandon the Shining Path organization outright, he claimed that he moved gradually to the periphery of the organization and refrained from participating in violent acts.

As part of a series of crackdowns against Shining Path, Peruvian police surrounded the University in September of 1986. Authorities arrested several MRTA leaders, exposed secret meeting places, and confiscated hidden propaganda and explosives. Huaman avoided arrest. In the aftermath of the raid, the remaining MRTA

leadership began to suspect the presence of a traitor, someone who was privy to names of leaders and locations of secret meeting and hiding places. Huaman was questioned about being the traitor, but he denied the charge.

After this denial, petitioner remained on the fringes of the organization. He believed, however, that some MRTA members continued to suspect him as a traitor because he had not enthusiastically embraced the tactics of Shining Path. For about two months, Huaman felt he was picked on, and he got into a series of fistfights with MRTA members. In late 1986 or early 1987, he left the University.

In February of 1987, Peruvian authorities again raided the University as part of a larger operation against Shining Path. Petitioner thought he might again be suspected of being a traitorous informer, so he left Peru three days after the February raid. He exited the country with a passport issued to him in his correct name by the Peruvian government just five months before his departure. Less than a month later, Huaman made his illegal entries into the United States.

Petitioner had a hearing before an immigration judge in early 1988. The IJ considered Huaman's testimony at the hearing to be credible. The IJ concluded that "a reasonable person in [Huaman's] circumstances would fear persecution from the MRTA," as well as "persecution by the authorities in Peru," and therefore found the petitioner eligible for asylum. The IJ also concluded that Huaman had met the higher standard for withholding of deportation because it was "more likely than not that [he] would be persecuted by MRTA for his political opposition to that organization," but that Huaman had not met the higher standard of proving a probability of persecution by the Peruvian government.

The Immigration & Naturalization Service appealed to the BIA, and the BIA reversed the IJ. The BIA concluded that Huaman had not established a basis for a well-founded fear of persecution by either MRTA or the Peruvian government because he had not presented evidence that MRTA leadership actually believed him to be a traitor or that the Peruvian government was even aware of his affiliation with MRTA. The BIA also held that, having failed to meet the burden for asylum, petitioner necessarily could not meet the higher burden for withholding of deportation.

Huaman now appeals the BIA's decision.

## II.

■ Huaman's first set of arguments relates to the appropriate standard of review for appeals of deportation orders. First, Huaman argues that the BIA erred in reviewing the decision of the immigration judge de novo, when it was required to defer to the IJ's findings unless those findings were not supported by substantial evidence. Second, Huaman urges that, when confronted with contrary findings by the BIA and IJ on asylum eligibility, this court should defer to the IJ as the first-instance factfinder. We reject both arguments because they misconstrue the BIA's, and our own, role in deportation proceedings.

Huaman argues that the BIA should not review IJ asylum decisions de novo because the IJ is in the best position to assess the witness credibility which lies at the heart of all applications for asylum. This argument, however, ignores the specific administrative procedure established for asylum cases. The procedure calls for the BIA to review IJ decisions on appeal, and it does not limit the scope of this review in any way. *See* 8 C.F.R. §§ 3.1(b)(2), 208.18(c), and 242.21. The BIA, not the IJ, wields ultimate authority over asylum decisions, subject only to the specific intervention of the Attorney General. 8 C.F.R. § 3.1(h). The BIA clearly has the power to review an IJ's findings de novo, to make its own findings even as to matters of credibility, and to assess the legal sufficiency of the evidence. *Ghassan v. INS*, 972 F.2d 631, 635 (5th Cir.1992); *Martinez v. INS*, 970 F.2d 973, 974 (1st Cir.1992); *Charlesworth v. INS*, 966 F.2d 1323, 1325 (9th Cir.1992); *Damaize–Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986). Of course, there may be good reasons in a given case for the BIA to

credit the IJ's determinations, but there is no requirement that it do so.

■ This case demonstrates why the BIA should have de novo review authority in asylum cases. Determinations of whether an individual has a "well-founded fear of persecution" involve not only a subjective inquiry into what fear the individual feels but also an objective assessment of the specific facts on which that fear is based. In this case, Huaman's personal testimony obviously persuaded the IJ of Huaman's feeling of fear. What petitioner's case lacked, however, was real proof of any objective facts. Appropriate de novo review by a body like the BIA serves to assure that the statutory requirement that any fear of persecution be "well founded" will be rigorously applied.

■ Huaman next urges this court to take heightened notice of the IJ's ruling on the asylum issue and defer to the IJ when the decisions of the IJ and the BIA conflict. This argument ignores what we believe to be the appropriate standard of judicial review in deportation proceedings.

As a court of appeals, we review only the findings and order of the BIA, not those of the IJ. Section 106(a) of the Immigration and Nationality Act vests us only with the jurisdiction to review "final orders of deportation." 8 U.S.C. § 1105a(a). Final orders are entered only after all administrative remedies have been exhausted; thus final orders in deportation proceedings come from the BIA, the highest administrative tribunal. Other circuits have reached the same conclusion. *See, e.g., Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991); *Castillo–Rodriguez v. INS,* 929 F.2d 181, 183 (5th Cir.1991).

■ Further, the scope of our review of BIA decisions is narrow, not broad. The Supreme Court has stated that we must uphold the BIA's decision if it is supported by substantial evidence from the record as a whole. *INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). In other words, we can reverse the BIA only if the evidence presented by the petitioner "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.,* —— U.S. at ——, 112 S.Ct. at 817. This narrow standard of review recognizes the respect we must accord both the BIA's expertise in immigration matters and its status as the Attorney General's designee in deportation decisions. *See* 8 C.F.R. § 3.1(d)(1). We decline to vary the standard of review for the not uncommon situation of this case—when the BIA decides to overturn an IJ's ruling.

### III.

We move next to Huaman's substantive claims. Petitioner argues that the BIA applied the wrong standard for determining asylum eligibility, and that he met the correct standard. We reject both contentions. The BIA applied the correct standard for determining asylum eligibility, and substantial evidence supports the BIA's denial of eligibility for Huaman.

■ To be eligible for asylum, an alien must meet the definition of "refugee" under the Refugee Act of 1980 (the "Act"). Under the Act, a refugee is any person who is unable to return to his or her country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A).

■ The standard for proving a "well-founded fear of persecution" is the "reasonable person test." *M.A. v. INS,* 899 F.2d 304, 311 (4th Cir.1990) (en banc). An individual seeking asylum under this standard must show (1) that a reasonable person in the circumstances would fear persecution; and (2) that the fear has "some basis in the reality of the circumstances" and is validated with "specific, concrete facts." *Id.* (citations omitted). As mentioned above, this test has both subjective and objective elements—a subjective inquiry into what the applicant for asylum fears and an objective finding of facts on which to base that fear.

■ Additionally, petitioner has to show that his fear of persecution stems directly

from one of the five categories of persecution listed in the Act. Even aliens with a "well-founded fear" of persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears retribution over purely personal matters or general conditions of upheaval and unrest. *See Matter of Maldonado–Cruz*, 19 I. & N.Dec. 509, 512 (BIA 1988), *rev'd on other grounds*, 883 F.2d 788 (9th Cir.1989).

█ In petitioner's case, the BIA properly applied the above standards. Here petitioner relies too much on his own subjective fear. Huaman's testimony focuses on what MRTA might possibly do to him five years after he emphatically denied being a traitor, and what the Peruvian government might possibly do because of some alleged connection with Shining Path. Such hypotheses may give rise to fear on petitioner's part. They do not, however, establish asylum eligibility under the Act, absent some concrete facts that MRTA leadership actually believes Huaman is a traitor or that Peruvian authorities might actually move to persecute him.

As to the claim of persecution by the Peruvian government, there is no indication, much less concrete proof, that Peruvian authorities are concerned about any past associations between Huaman and MRTA. In fact, it is not even clear that Peruvian security much cares who petitioner is. If the Peruvian government had suspected Huaman to be a revolutionary terrorist, it would neither have issued him a passport five months before he left the country, nor allowed him to leave the country only three days after a massive crackdown against Shining Path. This evidence supports a finding that the petitioner has not shown a well-founded fear of persecution by his government.

As to the claim of persecution by MRTA and Shining Path, the record also indicates that Huaman did not meet his burden of proof. Petitioner offers nothing beyond his own barebones statement that MRTA considers him a traitor to their cause in 1992. He gives no concrete facts as to how his situation in Peru in 1992 would be any

different than it was from 1986 to early 1987. In that period, Huaman denied being the traitor, remained on the periphery of the MRTA organization, and was not persecuted politically by MRTA leadership.

During that period, Huaman does claim to have been picked on and to have gotten into fights with MRTA members. Frequently, petitioner would fight with more than one of his former colleagues at a time and he would be beaten up. These episodes, however, are not proof of the kind of intentional persecution required by the Act. Petitioner offers no indication that MRTA leadership directed the beatings, much less that the beatings were to persecute him for one of the five listed reasons. Absent more specific facts of intentional persecution in the record, the beatings could credibly be viewed by BIA as random fistfights into which Huaman was goaded because of personal animosities or policy disputes with some rank-and-file MRTA members. Violence of this sort is an all too common byproduct of civil unrest. Such violence, however, is not specific persecution, and every possible victim of random misfortune is not a refugee as defined by the Act. The statute speaks of a well-founded fear of persecution for specific reasons. It does not extend eligibility for asylum to anyone who fears the general danger that inevitably accompanies political ferment and factional strife.

## IV.

█ Petitioner is likewise ineligible for withholding of deportation. To qualify for withholding of deportation under § 243(h) of the Immigration and Nationality Act, an alien must prove a probability of persecution, a more stringent standard than a well-founded fear of persecution. 8 U.S.C. § 1253(h); *see also INS v. Cardoza–Fonseca*, 480 U.S. 421, 443–48, 107 S.Ct. 1207, 1219–21, 94 L.Ed.2d 434 (1987). The BIA's determination that petitioner did not meet the asylum standard necessarily means that petitioner did not meet his burden on the more difficult withholding of deportation claim. *See Castillo–Rodriguez*, 929 F.2d at 185; *see also Quintanilla–Ticas v.*

*INS,* 783 F.2d 955, 956–57 (9th Cir.1986) (holding that the BIA need not assess evidence twice for the two standards).

For the foregoing reasons, the petition for review is hereby dismissed, and the judgment of the Board of Immigration Appeals is

*AFFIRMED.*