UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GUEHENNO LABORDE,
Petitioner,

v.

No. 96-2812

U.S. IMMIGRATION & NATURALIZATION
SERVICE; UNITED STATES  OF AMERICA,
Respondents.

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A72-848-808)

Argued: March 5, 1998

Decided: May 6, 1998

Before WILKINS and HAMILTON, Circuit Judges, and
BROADWATER, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Petition for review denied and order of board affirmed by unpublished
per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Kathleen Mary Cronin, ANDERSON, KILL & OLICK,
P.C., New York, New York, for Petitioner. Elizabeth A. Welsh,
Senior Litigation Counsel, Office of Immigration Litigation, Civil
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Respondents. **ON BRIEF:** Linda M. Weinberg,

VERNER, LIIPFERT, BERNHARD, MCPHERSON & HAND, CHARTERED, Washington, D.C., for Petitioner. Frank W. Hunger, Assistant Attorney General, Charles E. Pazar, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Guehenno Laborde (Laborde) petitions for review of a final order of the Board of Immigration Appeals (the Board) denying him political asylum and withholding of deportation under the Immigration and Nationality Act (the Act), 8 U.S.C.A. §§ 1101-1537 (West 1970 & West Supp. 1998). Because substantial evidence supports the Board's order, we deny the petition for review and affirm the Board's order.

I.

Laborde, a native and citizen of Haiti, was born on February 9, 1969, is single, and has no children. He attended school in Haiti through the high school level and arrived in the United States on December 30, 1993, carrying fraudulent entry documentation. The Immigration and Naturalization Service (INS) immediately detected the fraudulent nature of Laborde's entry documentation and charged him with being excludable for attempting to enter the United States with fraudulent entry documentation and for attempting to enter the United States without valid entry documentation. See 8 U.S.C.A. §§ 1182(a)(6)(C)(i), (a)(7)(A)(i)(I) (West Supp. 1998).

Laborde conceded excludability, but applied for asylum and withholding of deportation. His application stated that he had suffered persecution in Haiti on account of his political opinions at the hands of a group known as Front for the Advancement and Progress of Haiti

2

(FRAPH).[1] His application also stated that he fears future persecution in Haiti also at the hands of FRAPH on account of his political opinions.

On April 14, 1995, an immigration judge (IJ) held a hearing on Laborde's application for asylum and withholding of deportation. Before the IJ, Laborde also sought asylum and withholding of deportation because he feared future persecution from FRAPH on account of his membership in the following alleged social groups: (1) persons who refused to join FRAPH; (2) educated, Christian young men from a particular neighborhood who were also Aristide supporters; and (3) returning Haitians.

Laborde testified at the hearing, with the majority of his testimony focusing on his claim that he feared persecution by FRAPH on account of his pro-Aristide political opinions. Laborde testified that neither he nor his family had actively participated in Haitian politics, but that he voted in favor of Aristide in the 1990 presidential election. Laborde did not present any evidence suggesting that FRAPH knew that he had voted for Aristide.

According to Laborde, he first encountered FRAPH in September or October 1993 when he received a FRAPH recruitment letter at his aunt's store in a Port-au-Prince neighborhood generally considered pro-Aristide. At the time, Laborde managed his aunt's store and lived with her in a different neighborhood also generally considered pro-Aristide.[2] Several other young men in the neighborhood of the store also received the same letter, which explained that FRAPH wanted to create an office in that neighborhood and wanted the support of the youth. Laborde testified that he was afraid after receiving the letter,

_____

[1] FRAPH is a paramilitary organization, first organized in September 1993 in opposition to the plan for Jean Bertrand Aristide (Aristide) to return as Haiti's President on October 30, 1993. Aristide had been ousted by a military coup in September 1991. The evidence in the record is undisputed that FRAPH's operation consisted mainly of crimes and murders.

[2] Laborde was twenty-four-years-old at the time. He had lived with his aunt since age fifteen. Prior to living with his aunt, Laborde lived with his parents and siblings in a small town three hours from Port-au-Prince.

3

because according to him, FRAPH's object was to "destroy" and "break everything in Haiti." (A.R. at 179). **3**

Laborde further testified that two weeks after he received the recruitment letter, several members of FRAPH came to his aunt's store for his response. Specifically, the members showed him their FRAPH membership cards and asked if he received the letter. Laborde answered their inquiry by putting thirty dollars in an envelope and handing it to them. According to Laborde, a donation of money to FRAPH is an indication that one does not want to belong to the group. After this, the members of FRAPH peacefully left the store.

According to Laborde, two weeks later two unknown persons came to his aunt's house asking for him, but he was not there. Laborde suspected they were members of FRAPH, because the same persons came looking for him at his aunt's house the next night, and, upon being advised by his aunt that Laborde no longer lived with her, the unknown persons responded that they would find Laborde.

Laborde testified that these events cumulatively caused him to go into hiding for three months until his parents made arrangements for him to leave Haiti. After leaving Haiti, Laborde learned that members of FRAPH came looking for him at his parents' home. When his father refused to open the door, the members threatened to knock the door down. According to Laborde, the members ransacked the house and pushed around both his father and his sister. Laborde did not offer any testimony or other evidence regarding any other actions by FRAPH with respect to him, but did indicate that he wants to return to Haiti someday, but to return now would put his life in danger.

Laborde admitted at the hearing that neither he nor any member of his family reported any of the incidents that he described to the Haitian authorities. Furthermore, Laborde acknowledged that he has no reason to fear the current Haitian government, and that the new Haitian police force is free of FRAPH members and will secure Haiti in time. Laborde also acknowledged that following his arrival in the

_____

**3** In this opinion, specific citations to the Administrative Record are introduced by "A.R."

4

United States, the political situation in Haiti changed to such an extent that the leader of FRAPH, Emmanuel Constant, fled Haiti and is now living in the United States. Haiti has asked the United States to extradite Constant. Moreover, Laborde acknowledged that no member of FRAPH, including Constant, has attempted to contact him in the United States.

The evidence established that members of FRAPH frequently used violence against those who refused to join their ranks. However, it also established that FRAPH's power is on the decline. Indeed, evidence at the hearing established that since Laborde entered the United States in late 1993, major improvements in Haiti's political stability have occurred. Aristide has since returned to power, and the United States and multi-national forces sent troops to Haiti to ensure its political stability. Indeed, Laborde admitted at the hearing that the climate in Haiti is now such that a person could report persecution to the authorities.

After considering all of the evidence, the IJ denied Laborde's application for asylum and withholding of deportation, and ordered Laborde excluded and deported. The IJ found that Laborde did not suffer past persecution and does not have a well-founded fear of future persecution upon deportation on account of any statutory ground. Notably, the IJ found that there was insufficient evidence in the record to conclude that FRAPH's actions toward Laborde after he contributed $30 to FRAPH were motivated by a perception that he was a political opponent, rather than simply an unwilling recruit.

Laborde appealed the IJ's decision to the Board, which dismissed his appeal as being without merit. The Board denied Laborde's asylum and withholding of deportation claims premised on his allegations of past persecution on account of his political opinions on the twin grounds that FRAPH's actions toward Laborde did not rise to the level of persecution and that Laborde failed to prove that FRAPH took any action against him on account of his political opinions. The Board denied Laborde's claims premised on his alleged fear of future persecution on account of his political opinions on the twin grounds that Laborde did not prove that FRAPH would seek to persecute him on account of his political opinions and that since FRAPH's power had so declined since Laborde left Haiti, his fear did not have a basis

5

in reality. The Board disposed of Laborde's claims of asylum and withholding of deportation based on his alleged membership in various social groups without determining whether these alleged social groups constitute "social groups" as contemplated by the Act. The Board disposed of these claims on the basis that FRAPH's power has so largely waned since Laborde left Haiti and Aristide returned to power that Laborde did not have a well founded fear of persecution by FRAPH upon his return to Haiti. Laborde noted a timely appeal of the Board's final order to this court.

II.

The Act currently provides two means by which an otherwise deportable alien claiming that he will be persecuted if returned to his country of origin may avoid deportation. The first is found in § 208(a) of the Act, 8 U.S.C.A. § 1158(a) (West Supp. 1998). Pursuant to that section, an alien may apply for asylum. Section 208(b)(1) of the Act, 8 U.S.C.A. § 1158(b)(1) (West Supp. 1998), authorizes the Attorney General of the United States, in her discretion, to confer asylum on an alien who has properly applied for asylum if the Attorney General "determines that such alien is a refugee" as defined by the Act. Id. The Act defines the term "refugee," in pertinent part, as any person unwilling or unable to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C.A. § 1101(a)(42)(A) (West Supp. 1998). The reasonable person test is the standard for proving a well-founded fear of persecution. See M.A. v. INS, 899 F.2d 304, 311 (4th Cir. 1990) (en banc). We have held that "[a]n individual seeking asylum under this standard must show (1) that a reasonable person in the circumstances would fear persecution; and (2) that the fear has some basis in the reality of the circumstances and is validated with specific, concrete facts." Huaman-Cornelio v. Board of Immigration Appeals, 979 F.2d 995, 999 (4th Cir. 1992) (internal quotation marks omitted).

The second means by which an otherwise deportable alien claiming that he will be persecuted if returned to his country of origin may avoid deportation is found at § 241(b)(3) of the Act, 8 U.S.C.A. § 1231(b)(3) (West Supp. 1998). Prior to Congress' enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of

6

1996 (IIRIRA), Pub. L. No. 104-208, 1996 U.S.C.C.A.N. (110 Stat.) 1570-1861, on September 30, 1996, the substance of this section was found at § 243(h) of the Act, 8 U.S.C. § 1253(h).**4** Section 243(h), commonly referred to as the withholding of deportation provision, provided, in pertinent part, that "[t]he Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1253(h) (West Supp. 1996). To qualify for withholding of deportation under this provision, an applicant must demonstrate a"'`clear probability of persecution'" on account of one of the enumerated factors. <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 430 (1987). This standard is more stringent than the standard for granting asylum. <u>See id.</u> at 431-32. Thus, if an alien is unable to meet the less stringent asylum standard, he or she will be unable to meet the more difficult standard for withholding of deportation. <u>See Huaman-Cornelio</u>, 979 F.2d at 1000.

III.

On appeal before us, Laborde continues to press his asylum and withholding of deportation claims alleging past political persecution at the hands of FRAPH and a well-founded fear of political persecution if he is returned to Haiti. In this regard, he first argues that the Board ignored evidence that FRAPH must have imputed a pro-Aristide political opinion to him on account of his being an educated young man working and living in pro-Aristide neighborhoods, who refused to join FRAPH. Assuming that we agree with his first argument, Laborde argues that the Board ignored evidence that FRAPH is not yet under control, and thus presents a serious threat to him if he is returned to Haiti.**5**

_____

**4** Because Laborde was in exclusion proceedings prior to April 1, 1997, the effective date of the IIRIRA, we apply the preamendment version of the Act's withholding of deportation provision. <u>See</u> IIRIRA, § 309(a),(c)(1), Pub. L. No. 104-208, 1996 U.S.C.C.A.N. (110 Stat.) 1697-98.

**5** Because Laborde failed to brief or argue whether he should prevail on his claims for asylum and withholding of deportation premised upon his

7

We must uphold the Board's dismissal of Laborde's appeal of the IJ's order denying him asylum and withholding of deportation and ordering him excluded and deported if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole . . . ." 8 U.S.C.A. § 1105a(a)(4) (West Supp. 1998).[6] In particular, we cannot reverse the Board's determination that Laborde is not entitled to political asylum unless we conclude that the evidence presented by Laborde "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 483-84.

We conclude that the evidence presented by Laborde was not so compelling that a reasonable fact finder could fail to find the requisite fear of persecution. Laborde's proof is particularly lacking of probative evidence that FRAPH sought to persecute him on account of his political opinions prior to his fleeing Haiti or that it would seek to persecute him on account of his political opinions if he returned to Haiti. First, Laborde admits that neither he nor his family was politi-

_____

membership in the various individual social groups that he identified, we consider Laborde to have abandoned those claims. See 11126 Baltimore Blvd. v. Prince George's County, Md., 58 F.3d 988, 993 n.7 (4th Cir. 1995) (relying on Federal Rule of Appellate Procedure 28(a)(6) and holding that issues not briefed or argued in federal appeal are deemed abandoned). Accordingly, we do not address those claims. Furthermore, we do not address Laborde's claims, not previously raised below, that he is entitled to asylum and withholding of deportation on account of his membership in the social group he identifies as draft age men. Having failed to exhaust his administrative remedies with respect to these claims, we lack subject matter jurisdiction to consider them. See Farrokhi v. INS, 900 F.2d 697, 700 (4th Cir. 1990).

[6] Section 306(b) of the IIRIRA, Pub. L. No. 104-208, 1996 U.S.C.C.A.N. (110 Stat.) 1668, repealed 8 U.S.C.§ 1105a(a)(4) and replaced it with 8 U.S.C. § 1252(b)(4). However, because the Board issued its final order of exclusion with respect to Laborde after October 30, 1996, the transitional rules contained in the IIRIRA provide for judicial review pursuant to 8 U.S.C. § 1105a(a)(4) as that section existed prior to the enactment of the IIRIRA on September 30, 1996. See IIRIRA, § 309(c)(4), Pub. L. No. 104-208, 1996 U.S.C.C.A.N. (110 Stat.) 1699.

cally active in Haiti. Second, there is no evidence to suggest that Laborde's family has become politically active since Laborde entered the United States. Third, there is no evidence that FRAPH knew that Laborde had voted for Aristide in the 1990 presidential election. Fourth and finally, a person's resistance to forced recruitment by a politically motivated organization, without more, does not compel the conclusion that any subsequent adverse actions taken against the person by that organization were taken on account of that person's political opinions. See INS v. Elias-Zacarias, 502 U.S. 478, 482-485 (1992).

The facts of Elias-Zacarias are strikingly similar to the present case. In Elias-Zacarias, Jario Jonathan Elias-Zacarias, a native of Guatemala, applied for asylum and withholding of deportation. See id. at 479. He claimed to have suffered persecution and to have a well-founded fear of persecution on account of his political opinions based on his refusal to join an anti-government guerrilla organization that attempted to recruit him. Id. at 479-80. As with Laborde, the members of the organization attempted to recruit Elias-Zacarias during an unannounced face-to-face visit. Id. at 479. Like Laborde, Elias-Zacarias refused the organization's recruitment efforts without explanation. Id. Afraid that the guerrillas would return, Elias-Zacarias fled Guatemala and illegally entered the United States. Id. at 480.

The IJ denied Elias-Zacarias' application on the basis that Elias-Zacarias failed to demonstrate persecution or a well-founded fear of persecution on account of any of the statutorily enumerated grounds. Id. at 480. The Board agreed, but the Ninth Circuit reversed. See INS v. Elias-Zacarias, 921 F.2d 844 (9th Cir. 1990). The Ninth Circuit held that an anti-government guerrilla organization's attempt to conscript a person into its military forces necessarily constitutes persecution on account of political opinion, because "the person resisting forced recruitment is expressing a political opinion hostile to the persecutor and because the persecutor's motive in carrying out the kidnaping is political." Id. at 850.

The Supreme Court reversed the Ninth Circuit. The Court rejected as untrue the premise that a person resisting forced recruitment is necessarily expressing a political opinion hostile to the persecutor. See Elias-Zacarias, 502 U.S. at 481-82. The Court noted that "[e]ven a

9

person who supports a guerrilla movement might resist recruitment for a variety of reasons--fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." Id. at 482. The Court rejected as irrelevant the fact that a persecutor's general motive in carrying out forced recruitment efforts is political. Id. at 481-82. The Court stressed that eligibility for asylum and withholding of deportation turns on whether the persecution is "on account of the victim's political opinion, not the persecutor's." Id. at 482.

Applying these precepts to the facts before it, the Court held that the Board's determination that Elias-Zacarias failed to establish his eligibility for asylum should have been upheld in all respects. In this regard, the Court concluded that Elias-Zacarias' evidence on the issue of whether the anti-government guerrilla organization sought to persecute him on account of his political opinions was not "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 483-84.

Laborde contends that his case is distinguishable from Elias-Zacarias, pointing to evidence that he contends establishes that FRAPH imputed pro-Aristide political opinions to him on account of his being an educated young man who worked and lived in neighborhoods known for loyalty to President Aristide. Laborde first points to the following statements by William G. O'Neil, a consultant to the National Coalition for Haitian Refugees and to the United Nations/Organization Of American States International Civilian Mission to Haiti, made in an affidavit dated January 9, 1995:

> FRAPH conducted a campaign of terror, especially in neighborhoods known for their loyalty to [Aristide] like Carrefour-Feuilles and its environs where Mr. Laborde lived and the Quartier Bolosse where he worked. These neighborhoods were especially targeted by the military and FRAPH; men of Mr. Laborde's age group were particularly at risk since they were viewed as prime Aristide supporters.

(A.R. at 262). Laborde also relies on a portion of an August 1993 report prepared by the United States Department of Justice that can reasonably be construed as stating that students of Laborde's education level were generally considered by the military government in power at the time to be pro-Aristide. The report also stated that the

military targeted student leaders and student organizations for particularly fierce treatment and recognized that massive political violence had been deployed against children and young adolescents in retribution for participation in social movements.

We cannot reverse the Board unless the evidence cited by Laborde is such that no reasonable fact finder could fail to find that FRAPH imputed pro-Aristide political opinions to Laborde, and sought to persecute him on account of those political opinions. See Elias-Zacarias, 502 U.S. at 483-84. The evidence cited by Laborde is simply too general to compel such a finding in light of the undisputed evidence in the record that FRAPH sought to recruit Laborde during its initial organization. In the absence of evidence that FRAPH sought to swell its ranks solely with pro-Aristide recruits, the Board drew a permissible inference that FRAPH conducted recruitment efforts without regard to the actual political opinions of a potential individual recruit. For the same reason, the evidence does not compel a finding that FRAPH's subsequent actions with respect to Laborde were on account of Laborde's political opinions rather than simply his unwillingness to join FRAPH.

Because Laborde's second argument that the Board ignored evidence that FRAPH is not yet under control depends upon us agreeing with his first argument, we need not address this second argument. Furthermore, the Board's determination that Laborde did not meet the asylum standard "necessarily means" that he "did not meet his burden on the more difficult withholding of deportation claim." Huaman-Cornelio, 979 F.2d at 1000.

IV.

For the foregoing reasons, we deny Laborde's petition for review and affirm the Board's order.[7]

PETITION FOR REVIEW DENIED
AND ORDER OF BOARD AFFIRMED
_____

[7] We note that Laborde may be eligible for a deferral of his deportation until December 23, 1998 pursuant to a presidential directive signed by President William J. Clinton on December 23, 1997. The subject of the memorandum containing the directive is "Measures Regarding Certain Haitians in the United States."

11