**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CESAR ADOLFO MORALES-SAMAYOA,
Petitioner,

v.

U.S. IMMIGRATION & NATURALIZATION
SERVICE,
Respondent.

No. 98-2096

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A70-794-353)

Submitted: March 9, 1999

Decided: March 25, 1999

Before WIDENER, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Ronald D. Richey, Rockville, Maryland, for Petitioner. Frank W.
Hunger, Assistant Attorney General, Michelle Gluck, Senior Litiga-
tion Counsel, Nelda C. Reyna, Office of Immigration Litigation,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Cesar Adolfo Morales-Samayoa petitions for review of a final order of the Board of Immigration Appeals (Board) denying his application for asylum and withholding of deportation. Because substantial evidence supports the Board's decision, we affirm.

The Immigration and Nationality Act (Act) authorizes the Attorney General, in her discretion, to confer asylum on any refugee. See 8 U.S.C.A. § 1158(a) (West Supp. 1998). The Act defines a refugee as a person unwilling or unable to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A) (West Supp. 1998); see M.A. v. INS, 899 F.2d 304, 307 (4th Cir. 1990) (en banc).

The "well-founded fear of persecution" standard contains both a subjective and an objective component. An applicant may satisfy the subjective element by presenting "`candid, credible, and sincere testimony' demonstrating a genuine fear of persecution." Berroteran-Melendez v. INS, 955 F.2d 1251, 1256 (9th Cir. 1992) (citation omitted); see Figeroa v. INS, 886 F.2d 76, 79 (4th Cir. 1989). The objective element requires a showing of specific, concrete facts that would lead a reasonable person in like circumstances to fear persecution. See Huaman-Cornelio v. Board of Immigration Appeals, 979 F.2d 995, 999 (4th Cir. 1992).

Eligibility for asylum can also be based on grounds of past persecution alone even though there is "`no reasonable likelihood of present persecution.'" Baka v. INS, 963 F.2d 1376, 1379 (10th Cir. 1992) (quoting Rivera-Cruz v. INS, 948 F.2d 962, 969 (5th Cir. 1991)). To establish such eligibility, an alien must show past persecution so severe that repatriation would be inhumane. Id. ; Matter of Chen, 20 I. & N. Dec. 16 (BIA 1989).

2

We must uphold the Board's determination that Morales-Samayoa is not eligible for asylum if the determination is"supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (1994).* We accord the Board all possible deference. See Huaman-Cornelio, 979 F.2d at 999. The decision may be "reversed only if the evidence presented by [Morales-Samayoa] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

Morales-Samayoa, a native and citizen of Guatemala who entered the United States without inspection in July 1992, disagrees with the Board's finding that he failed to establish past persecution or a well-founded fear of future persecution in his home country based on his union-related and political activities. We conclude substantial evidence supports the Board's finding that Morales-Samayoa did not satisfy his statutory burden.

Evidence established that in 1984, Morales-Samayoa began working for Mayatrak, a company which repairs industrial machinery. In 1989, he joined a secret work union as a spokesperson and activist. He was never elected to a leadership position. By 1990, the union had a peak membership of twenty-two workers. The union opposed the company's low wages and poor treatment of workers, and aimed to attain the minimum wage and better communication with management. At least one time in 1991, the union joined the union of another company to strike in protest of the high cost of transportation.

Morales-Samayoa testified that he believed the company owners were unaware of the union until 1991, when the company began firing union members for no apparent reason. Although he testified that no one knew the reason for the firings, he believed they were related to

_____

*We note that 8 U.S.C. § 1105a(a)(4) was repealed by the Illegal Immigration Reform Immigrant Responsibility Act of 1996, Pub. L. No. 104-128, 110 Stat. 3009 (IIRIRA), effective April 1, 1997. Because this case was in transition at the time the IIRIRA was passed, 8 U.S.C. § 1105a(a)(4) is still applicable under the terms of the transitional rules contained in § 309(c) of the IIRIRA.

3

the union's growing strength. He did not know what became of the individuals who organized his company's union.

In March 1992, Morales-Samayoa received an anonymous letter telling him to quit the union. Although he did not know who sent the letter, he suspected it was sent by the company owners who had recently become aware of his union membership. In April 1992, Morales-Samayoa was fired from his job because, he believes, of his union membership. The union was dissolved in 1992. In May 1992, two men dressed in suits and wearing sunglasses visited Morales-Samayoa's mother's neighborhood. They identified themselves as friends of Morales-Samayoa and asked her neighbors if they knew his whereabouts. Morales-Samayoa did not know who these men were but suspected they were from the Department of Technical Investigations (DIT) because of the way they were dressed. Morales-Samayoa testified that the DIT was known for making people disappear. On a second occasion, the men returned looking for him and he again was not home. They told his father-in-law they would return but never did. Morales-Samayoa went to live with his brother.

In June 1992, Morales-Samayoa joined the Mutual Support Group (GAM), a group opposed to the government. He participated in three demonstrations in support of a national salary and against the government's human rights violations. In July 1992, Morales-Samayoa left Guatemala because, he testified, the men he believed were from the DIT began looking for him more regularly. After he left, the suspected DIT men had no further contact with his friends or family. However, Morales-Samayoa testified that he learned from his wife that she still gets calls from purported friends asking if he has returned to Guatemala. He believes the calls are from the DIT men. He claims he fears for his safety upon return and for the safety of his wife and three children, who still live in Guatemala.

Morales-Samayoa disagrees with the Board's finding that he did not suffer past persecution. We find, however, that substantial evidence supports the Board's finding that even if Morales-Samayoa received an anonymous note warning him to quit the union, was fired from his job, and was sought by unknown men, these events do not rise to the level of persecution. Neither Morales-Samayoa nor his family were ever actually harmed. Moreover, Morales-Samayoa pre-

4

sented no evidence beyond his testimony that the individuals he testified were searching for him were affiliated with the government.

We also conclude substantial evidence supports the Board's finding that Morales-Samayoa lacks an objective basis to fear harm for any reason on a countrywide basis. See Matter of Acosta, 19 I. & N. Dec. 211, 235 (BIA 1985). As the Board observed, Morales-Samayoa was merely a spokesperson for a union that dissolved years ago. While the State Department country report does indeed cite numerous incidents in which union officials and their family members suffered threats, assassination attempts, kidnappings, and physical harm, there is no evidence in the record that Morales-Samayoa or his fellow union members experienced such problems. And while he claims his wife still receives inquiries about his whereabouts, he presented no evidence to corroborate his claim and did not establish that he could not have relocated safely to another part of the country.

Because Morales-Samayoa has not established eligibility for asylum, he cannot meet the higher standard for withholding of deportation. See INS v. Cardoza-Fonseca, 480 U.S. 421, 430-32 (1987). We accordingly affirm the Board's order. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

5