**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICARDO PAZ RAMOS; BERTA A.
PAZ; AMAGAILIS PAZ; TERESA DE
JESUS PAZ MANSILLA; MELVIN
RICARDO PAZ; BERTA ALICIA PAZ,

*Petitioners,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 08-1271

On Petition for Review of an Order
of the Board of Immigration Appeals.

Argued: September 22, 2011

Decided: October 27, 2011

Before WILKINSON, WYNN, and FLOYD, Circuit Judges.

Petition denied by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Judge Floyd joined.

## COUNSEL

**ARGUED:** Aaron Robert Caruso, ABOD & CARUSO, LLC, Rockville, Maryland, for Petitioners. Kathryn L. DeAngelis, UNITED STATES DEPARTMENT OF JUSTICE, Washing-

ton, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Civil Division, Terri J. Scadron, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

WILKINSON, Circuit Judge:

Ricardo Paz Ramos entered the United States illegally from Guatemala in 1989, and his wife Berta and their four children followed. Each child's arrival in the United States involved a similar sequence of events—Ricardo and Berta sent several thousand dollars to the child at a hotel in Mexico, who arrived illegally in the United States promptly thereafter. The Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") both determined that Ricardo's and Berta's monetary assistance amounted to "alien smuggling" pursuant to section 212(a)(6)(E) of the INA, and that they thus lacked the "good moral character" necessary for cancellation of removal. Because the IJ and BIA properly interpreted and applied the "alien smuggling" provision, we deny the petition for review.

I.

Ricardo Paz Ramos, his wife Berta Paz, and their four children, Amagailis, Teresa, Melvin and Berta Alicia, are natives and citizens of Guatemala. They all entered the United States without admission or parole over the past several decades, beginning with Ricardo in May 1989.

Ricardo's four children arrived in the United States between 1997 and 2001. The arrival of each child followed the same pattern. Amagailis was the first to enter the United States. In 1997, she called Ricardo from a hotel in Mexico

and asked him to send money. She arrived in the United States shortly after Ricardo sent $3,500. In 1999, Melvin did the same; he called Ricardo from a hotel in Mexico to request money and entered the United States not long after receiving $3,500 from Ricardo. Also in 1999, Teresa called Ricardo from a hotel in Mexico with a similar request for funds. Ricardo sent $3,000 and Teresa then arrived in the United States. Finally, in 2001, Berta Alicia called Ricardo from a hotel in Mexico to ask for money and promptly arrived in the United States after receiving $4,000 from Ricardo.

According to Ricardo's testimony in Immigration Court proceedings, the money he sent to the hotels in Mexico was intended to enable his children to travel to the United States. Asked what the money he sent to the children was to be used for, Ricardo answered: "So they could arrive" and "[t]o go through—to go to this side." With respect to Amagailis, Ricardo testified, "I sent her money so she could come" and "she was at the hotel and . . . we just sent the money, so she could just cross." Berta confirmed that the money was sent to help her children reach the United States. She testified that she and Ricardo jointly decided to send the children money in Mexico and that she knew the money was to be used "[t]o cross the border" and that it was sent "so they could come over here, cross the border." Ricardo admitted that he was aware his children did not have the necessary papers to come to the United States. He testified: "I think I was violating the law . . . . [t]o help my children to enter into this country illegally."

## II.

### A.

Ricardo's and Berta's testimony was offered in Immigration Court proceedings pertaining to Ricardo's application on June 23, 2000 for Special Rule Cancellation of Removal under the Nicaraguan Adjustment and Central American

Relief Act, Pub. L. No. 105-100, 111 Stat. 2160, 2196 (1997) ("NACARA").**[1]**

Congress enacted NACARA to amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which replaced suspension of deportation relief with cancellation of removal—the latter a more demanding standard for those seeking to block their deportation from this country. *See* 8 U.S.C. § 1229b(b)(1). NACARA reduced the prospect of massive deportations of long-term U.S. residents from several countries, including Guatemala, as a result of IIRIRA's passage. Section 203 of NACARA permits aliens who satisfy specific criteria to apply for pre-IIRIRA suspension of deportation relief, instead of the more stringent post-IIRIRA cancellation of removal, even if they were charged with removability or inadmissibility after the effective date of IIRIRA. NACARA § 203(f). Section 203 also covers the spouse or children of a qualifying alien. *See* 8 C.F.R. § 1240.61(a)(4).

It is undisputed that as a national of Guatemala who first entered the United States before October 1, 1990, Ricardo was eligible to apply for NACARA cancellation of removal. *See id.* § 1240.60-61. At that point, in order to obtain relief Ricardo was required to demonstrate, among other things, that he had been continually present in the United States for at least seven years before his application date and that he had been a person of "good moral character" during that seven year period. *See* 8 C.F.R. § 1240.66(b).

Under the INA's general definition provision, a person is *per se* ineligible to be "regarded as, or found to be, a person of good moral character" if, *inter alia*, that person is an alien "smuggler" described in section 212(a)(6)(E) of the INA, 8

---

**[1]**Petitioners also sought asylum and withholding of removal, but the decisions adverse to petitioners on these issues are not the subject of this appeal.

U.S.C. § 1182(a)(6)(E). 8 U.S.C. § 1101(f)(3). Section 212(a)(6)(E) of the INA, entitled "Smugglers," applies to "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law." 8 U.S.C. § 1182(a)(6)(E). The burden of proof is on the applicant for NACARA cancellation to establish his qualification—including good moral character—by a preponderance of the evidence. *See* 8 C.F.R. § 240.64(a).

B.

Ricardo's application for NACARA cancellation of removal was referred to an IJ on August 31, 2004 by the United States Citizenship and Immigration Services, which found evidence that Ricardo failed to establish "good moral character" because "[d]uring the preceding seven years [he] knowingly encouraged, induced, aided and assisted [his] four children to illegally enter the United States in violation of immigration laws." On the same day, all six Paz family members received Notices to Appear in Immigration Court on the charge of inadmissibility pursuant to section 212(a)(6)(A)(i) of the INA for having entered the United States without admission or parole. They conceded removability as charged.

The IJ denied petitioners' application for NACARA cancellation on April 13, 2006.[2] She determined that Ricardo and Berta failed to establish the good moral character necessary to receive relief under NACARA because they had violated section 212(a)(6)(E) of the INA by knowingly assisting their children to illegally enter the United States. In reliance on

_____

[2]Berta was a derivative beneficiary on Ricardo's application and claimed independent eligibility for NACARA cancellation as well. Melvin and Berta Alicia are dependents on Ricardo's and Berta's claims. The IJ found that Amagailis did not qualify as a dependent because she was over 21 years old and entered the United States after October 1, 1990. *See* 8 C.F.R. § 1240.61(a)(5). The IJ additionally found that Teresa did not qualify as a dependent because she is married and entered after 1990.

Ricardo's and Berta's testimony, the IJ concluded that Ricardo and Berta "sent money jointly to enable their children to come in through the U.S.-Mexican border." According to the IJ, the testimony established that Ricardo and Berta were both "aware that their children had no documentation that would enable them to cross into the United States legally"; that Ricardo "had knowledge that [his children] could, or actually would, engage the assistance of smugglers"; and that Berta knew "that absent assistance from smugglers, her children would not have been able to enter the U.S." Upon conducting an independent review of the record, the BIA upheld the IJ's decision on appeal. This petition for review followed.

### III.

The determination that an alien is *per se* ineligible to establish the good moral character necessary for cancellation of removal "is essentially a legal determination involving the application of law to factual findings." *Jean v. Gonzales*, 435 F.3d 475, 482 (4th Cir. 2006).

We also begin our review of the decision below mindful of the deference owed the agency's determination in this area. First, we defer to the reasonable legal interpretations of the BIA, which is entrusted to interpret and enforce the INA. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'") (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)). Second, as we are not the original fact finders, our review of the agency's factual determinations is necessarily limited and we "must uphold the BIA's decision if it is supported by substantial evidence from the record as a whole." *See Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

## A.

As noted above, section 212(a)(6)(E) of the INA applies to "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law." 8 U.S.C. § 1182(a)(6)(E). Contrary to petitioners' contentions, the agency used the proper standard for evaluating the applicability of section 212(a)(6)(E) and substantial evidence supports the finding that Ricardo's and Berta's actions met this standard. We therefore defer to the agency's reasoned conclusion that Ricardo's and Berta's recurring attempts to financially facilitate their children's illegal entry into the United States satisfied both the assistance and knowledge requirements of the "alien smuggling" provision.

As to assistance, Ricardo and Berta provided the assistance necessary for each child to illegally enter the United States by sending thousands of dollars to a hotel in Mexico in answer to each child's request. As several of the children testified, they needed money to pay their way across the border. Melvin and Berta Alicia both testified that upon arrival at the border between Mexico and the United States they paid someone to aid them cross.

Each child's payment to cross the border came on the heels of his or her receipt of money from Ricardo and Berta. The testimony confirmed what this sequence of events suggests. Ricardo and Berta testified that the money they sent was essential for their children to make the crossing. Ricardo observed that Melvin "had to pay somebody to help [him] cross the border because he was a child." And as Berta acknowledged, the money was "so they could come over here" because "in Mexico there [are] always people there . . . offering that service [to cross the border]." The IJ thus had substantial reason to find that the money from Ricardo and Berta provided indispensible financial assistance for the illegal crossings.

With respect to knowledge, there was ample evidence to conclude that Ricardo and Berta aided their children "knowingly" based on the pattern of assistance. The children's arrival in the United States followed a strikingly similar sequence of events: after receiving a call from a hotel in Mexico asking for money, Ricardo and Berta would send the money and the caller would arrive in the United States shortly thereafter. The nearly-identical arrival process provides considerable reason to infer that at least by the time Ricardo and Berta received their second, third, and fourth calls from Mexico asking for money, they knew the money would be used to pay for illegal passage to the United States.

Ricardo himself spelled out the obvious significance of receiving a call from a transient hotel station near the United States border. Asked if he knew why Teresa went to Mexico, Ricardo answered: "Because in order to come here, she had to go through Mexico and all of us, as we came here, we went through Mexico." With respect to the money, when asked if he knew how Melvin was going to use it, Ricardo responded succinctly, "It was the same thing." Ricardo and Berta thus knew the drill; they were well aware—from experience—both of the purpose of the trip from Guatemala to Mexico and of the intended use for the funds.

Furthermore, Ricardo's and Berta's testimony was revealing not only as to what they knew, but also as to what they intended. Aware that his children did not have the necessary papers to come to the United States and that he "was violating the law," Ricardo nevertheless acknowledged that he endeavored "[t]o help [his] children to enter into this country illegally." Ricardo conceded that the money was to be used "[s]o they [the children] could arrive" and "[t]o go through—to go to this side." Berta likewise testified that she knew the money was to be used "[t]o cross the border" and that it was sent "so they could come over here, cross the border."

In light of Ricardo's own admissions during the Immigration Court proceedings, we cannot accept petitioners' after-

the-fact contention that the "record is abundantly clear in this case that [Ricardo] had no idea how the children would use his money to come to the United States." Petitioners' Br. at 13. Petitioners' own testimony firmly established that Ricardo and Berta provided monetary assistance knowing it would be used for an illegal entry into the United States.

B.

This application of Section 212(a)(6)(E) accords with decisions in other circuits to have considered the question. In *Urzua Covarrubias v. Gonzales*, 487 F.3d 742 (9th Cir. 2007), the court held that the alien was statutorily barred from establishing the good moral character necessary for suspension of deportation because he had collected money and arranged payment for a smuggler to assist his sibling across the border. The Ninth Circuit emphasized that "[a]n individual may knowingly encourage, induce, assist, abet, or aid with illegal entry, even if he did not personally hire the smuggler and even if he is not present at the point of illegal entry." *Id.* at 748 (internal quotation marks omitted). The Fifth Circuit has similarly concluded that the statute applies to "[a]ny alien seeking admission to the United States who participates in a scheme to aid other aliens in an illegal entry . . . regardless of whether the assisting individual was present at the border crossing." *Soriano v. Gonzales*, 484 F.3d 318, 321 (5th Cir. 2007).

These decisions lend support to the conclusion that physical presence at the border is not a necessary condition to satisfy section 212(a)(6)(E). Rather, as the plain language of the statute suggests, an affirmative act that facilitates the illegal entry, such as financial assistance, may suffice.[3]

---

[3]Petitioners' heavy reliance on a Sixth Circuit case, *Tapucu v. Gonzales*, 399 F.3d 736 (6th Cir. 2005), is misplaced. Tapucu's undisputed testimony was that while he knew his friend Deveci was an illegal alien he nonetheless thought Deveci could lawfully re-enter the United States.

## IV.

Arguing that the IJ and BIA applied the wrong standard, petitioners suggest various ways to restrict the scope of the "alien smuggling" statute, including adding a requirement that the acts involve the "commission of a compensable" act or an "illicit" act. They urge us, more generally, to articulate a uniform legal standard for making section 212(a)(6)(E) determinations.

We decline, however, to add limitations absent from the words of the statute. For example, the fact that Ricardo and Berta did not themselves receive financial compensation or commit an additional illicit act in the course of assisting the unlawful crossing does not place them beyond the statute's reach as they contend. The statute's language does not set forth a set of conditions to knowing assistance, such as presence at the border, compensation for assistance, or illicit activity. We have no cause to insert arbitrary limits into a statute, especially one that Congress "intended . . . to apply to a broad range of conduct." *Urzua Covarrubias*, 487 F.3d at 748.

On the other hand, we are not suggesting that any financial assistance to family members living outside the United States constitutes alien smuggling. The altogether human impulse to assist one's family may in an appropriate case confirm "good moral character," not undermine it. For example, Berta testified that she sent money monthly to her sister in Guatemala to help pay for expenses such as food and clothing. Financial assistance intended to improve quality of life in a foreign country—without a proximate border crossing or evidence of

With respect to assistance, the relevant behavior was an omission—Tapucu's failure to correct Deveci's misstatement to immigration officials at the U.S.-Canadian border. Here, Ricardo and Berta testified that they knew the children could not enter lawfully and affirmatively acted to aid their entry. In all events, we have no reason to assess the correctness of *Tapucu* here.

intent to facilitate illegal entry—presents a different case from the one before us here.

We therefore do not think it advisable either to place artificial limits on the statute or to delineate automatic qualifications for alien smuggling. Rather than script the contours of the statute, we trust that the agency will "give[ ] concrete meaning" to the statutory terms "through a process of case-by-case adjudication." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987). What constitutes knowing assistance will often depend on the totality of the circumstances, which the individual fact finder is best equipped to take into account as different factual circumstances arise.

What is clear, however, is that the agency was fully justified here in finding alien smuggling. The burden of proof was on petitioners, as illegal aliens, to demonstrate their qualification for cancellation of removal, including their good moral character. Instead, an obvious pattern of financial aid resulting in the children's arrival in the United States strongly suggested that Ricardo and Berta knowingly assisted illegal entry. This determination was only strengthened by Ricardo's and Berta's own testimony admitting intent to help their children cross the border in violation of the law. As a result, we have no reason to question the agency's application of the relevant law or to disturb the determination that petitioners lack the requisite good moral character to be eligible for cancellation of removal.

V.

For the foregoing reasons, the petition for review is denied.

*PETITION DENIED*