**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NEFTALI URZUA COVARRUBIAS,
                   *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

                   *Respondent.*

No. 03-74661

Agency No.
A70-912-560

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 7, 2006—Pasadena, California

Filed May 29, 2007

Before: Harry Pregerson, Barry G. Silverman, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge Pregerson

6351

## COUNSEL

Xavier Rosas, Law Office of Enrique Arevalo, Pasadena, California, for the petitioner.

John C. Cunningham, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Washington, D.C., for the respondent.

---

## OPINION

TALLMAN, Circuit Judge:

Neftali Urzua Covarrubias ("Urzua") petitions for review of an order of the Board of Immigration Appeals ("BIA") dismissing Urzua's appeal from the denial of his application for suspension of deportation under 8 U.S.C. § 1254(a) (repealed 1996).[1] The BIA agreed with the Immigration Judge ("IJ") and found Urzua statutorily barred from showing good moral character, *see* 8 U.S.C. § 1101(f)(3), because Urzua "knowingly . . . encouraged, induced, assisted, abetted[ ] or aided" his brother in unlawfully entering the United States under 8 U.S.C. § 1182(a)(6)(E)(i). We cannot say that the record compels a contrary result as substantial evidence supports the BIA's factual finding. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). We therefore deny the petition for review.

---

[1]The Immigration & Naturalization Service ("INS") initiated deportation proceedings on January 24, 1997. Because this case is governed by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), *see Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997), Urzua could pursue suspension of deportation under pre-IIRIRA law, *see Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 376-77 (9th Cir. 2003) (en banc). To qualify for suspension of deportation, Urzua must show: (1) physical presence in the United States for a continuous period of at least seven years; (2) good moral character for the duration of that period; and (3) the deportation would result in extreme hardship to the alien or spouse, parent, or child who is a citizen or lawful permanent resident of the United States. 8 U.S.C. § 1254(a)(1).

# I

Urzua, a native and citizen of Mexico, entered the United States without inspection on August 30, 1989. He filed an application for asylum on May 3, 1994. During his interview with an INS asylum officer on January 10, 1997, Urzua admitted to making several incorrect statements in his asylum application. On January 24, 1997, the INS filed an order to show cause charging Urzua as being deportable under 8 U.S.C. § 1251(a)(1)(B) (1996).

On March 26, 1997, Urzua conceded deportability through counsel. He then withdrew his application for asylum and indicated that he would seek suspension of deportation under § 1254(a), or, alternatively, voluntary departure under § 1254(e). He designated Mexico as the country of deportation.

During the merits hearing held on October 26, 2000, INS counsel questioned Urzua about his brother, Louis. In response, Urzua made several damaging admissions:

> Q: How about your, how about your brother, Louis, where does he live?
>
> A: Louis lives in Mexico with my parents.
>
> Q: Does Louis work?
>
> A: Over there, yes, he works in construction.
>
> Q: Do you support Louis?
>
> A: He was here last year and because of his immigration status, he was only able to work maybe one or two days per week. He would either do yards or anyone that would ask him to come and help them out, and he was with me for

about eight or nine months, during which time
I supported him.

Q:  And h[e] was in an illegal status when he was
staying with you?

A:  Yes.

Q:  When did he enter the United States?

A:  About in March.

Q:  Of which year?

A:  1999.

Q:  And when he entered, how did he enter?

A:  He came through [Nogales] as an illegal like
many of us do when we cross the border.

Q:  Well, did you know he was coming to stay with
you?

A:  Well, yes, he did, he told us he was coming and
we helped him out, paying his crossing.

Q:  Could you explain exactly what arrangements
you made to pay his crossing?

IJ to URZUA:

Q:  Where did [Louis] come from?

A:  He came from (indiscernible) Jalisco, Mexico.

Q:  And where did he enter the United States?

A:  Nogales, Mexico, crossing into Nogales, Arizona.

Q:  And how did he get to Nogales, did he drive, did he take a train, what did he do?

A:  A person that lives here had a station wagon or pickup truck and he went down there, and when he came back, he gave him a ride to Nogales.

Q:  And how did he get from Nogales to Los Angeles?

A:  We paid a person to cross the border, to cross him across the border and drive him to Los Angeles.

. . .

INS counsel to Urzua:

Q:  How much money did you pay the person to cross him across the border into Nogales?

A:  $1200.

. . .

Q:  How many times have you helped your brother Louis enter the United States illegally?

A:  That was the only time.

Soon after listening to Urzua's testimony, the IJ concluded the hearing by warning Urzua's counsel that "[she thought Urzua], unfortunately, ha[d] a statutory bar[ ] to good moral character." The IJ elaborated further on the effect of Urzua's sworn admissions, stating, "I do believe that [Urzua] is statu-

torily ineligible to establish good moral character because of having helped his brother enter the United States illegally. I think part of the problem is that he, [Urzua], is such a[n] honest person, that he just volunteered a little too much information." The IJ then reset the hearing to allow Urzua and his counsel to reconsider the issue. The IJ asked counsel to be prepared to discuss the statutory bar at the next hearing.

On April 26, 2002, the IJ held a second hearing on the merits. During this hearing, Urzua now testified that he had never asked his brother to come to the United States and that he did not know of his brother's plans until after his mother contacted him by telephone. Urzua stated that the day after he spoke with his mother, Louis called him from Nogales to ask for money. Urzua now claimed he did not know whether Louis called from the Mexican or United States side of the border. Louis asked Urzua for $1200, and although his brother did not specify why, Urzua stated that he believed Louis needed the money to pay the smuggler who helped him cross the border.

Urzua modified his prior sworn testimony to claim that he did not know the smuggler and that he made no arrangements to have the smuggler help Louis cross the border. Urzua testified that after Louis called him from Nogales, Urzua had arranged to get the money from other family members in the United States. Louis then called from a Wal-Mart parking lot on the United States side of the border to tell Urzua he had arrived. Urzua testified that, at this point, the smuggler took the phone from Louis and told Urzua to bring the money to the Wal-Mart parking lot alone. Urzua stated that he complied with the smuggler's request. He testified that, once he got out of his car in the parking lot, the smuggler approached him and asked if he was Louis's brother. Urzua responded, "Yes," but told the smuggler that he would not give him the money until he saw his brother. Urzua stated that, once he saw Louis, he handed Louis the money, and Louis then turned and gave the money to the smuggler. Although Urzua claimed to have

never met the smuggler before, he testified that he believed the unidentified individual was "[t]he person that had been helping [Louis] cross."

Upon further questioning, Urzua admitted that he knew Louis had decided to come to the United States three to five months prior to the actual smuggling incident. However, Urzua testified that he told Louis to wait to come to the United States. Urzua explained his brother's decision to ignore his earlier advice and come to the United States prevented Urzua from refusing to give Louis the money when his brother called from Nogales. "[Louis] had already made the decision to [come to the United States,] and one way or the other, he was going to do it." Moreover, Urzua testified that he feared that his brother would be in danger if he did not provide the money to the smuggler. Although he had no basis to question the smuggler's intent, Urzua testified that "[he] could have killed someone, killed the boy. I was afraid."

In a written decision and order, the IJ denied Urzua's application for suspension of deportation and his application for voluntary departure. Because both parties agreed that Urzua had established the requisite period of continuous physical presence, and that his deportation would result in extreme hardship to himself and his United States citizen child, the sole remaining issue was whether Urzua could establish good moral character. The IJ concluded that, because Urzua had knowingly encouraged, induced, assisted, abetted or aided in his brother's unlawful entry into the United States, Urzua was precluded under § 1101(f)(3) from establishing the requisite good moral character.

The IJ found that substantial facts in the record demonstrated that Urzua knowingly engaged in the alien smuggling scheme. "[Urzua] testified that he spoke to his brother telephonically several months before the smuggling incident," and, "[a]t that time, his brother had indicated his desire to come to the United States." Although Urzua "strongly

opposed his brother's wishes and advised him not to travel illegally to the United States," Urzua collected the $1200 fee, believing that the money would go to the person that was helping Louis cross the border. The IJ concluded that, "[w]hen examined cumulatively[,] these facts demonstrate that a reasonable person in [Urzua's] circumstances would conclude that the brother was attempting an illegal entry into the United States and [Urzua] was aware that the money was to be used for the smuggling fee." Moreover, although Urzua testified that "he felt obligated to provide the smuggling fee" out of fear for his brother's safety, the IJ concluded that she was "nonetheless . . . compelled to find that [Urzua] played a role in assisting with the illegal entry of another" because "[Urzua] collected the smuggling fee from his siblings and agreed to meet his brother to provide him with the fee."

In a per curiam order filed November 20, 2003, the BIA affirmed the IJ and dismissed Urzua's appeal. Noting that Urzua had the burden to show good moral character, the BIA relied, in part, on that fact that when Urzua agreed to pay the $1200 fee he was not concerned with whether Louis had already crossed the border. "[Urzua] was apparently willing to pay the smuggler in either event." Furthermore, "[Urzua] clearly knew his brother beforehand, and knew that his brother wished to cross the border illegally, as [Urzua] him-self had done some time ago." And "[Urzua] admittedly arranged payment to the smuggler[,] . . . collected the needed money from siblings[,] . . . agreed to a meeting place with the smuggler and then presented the money." Urzua then "trans-ported [Louis] from that meeting place to his own home where the brother stayed for months."

The BIA also addressed Urzua's argument that alien smuggling—as defined by § 1182(a)(6)(E)(i)—ends once the alien crosses the border. Citing *United States v. Angwin*, 271 F.3d 786 (9th Cir. 2001), *overruled in United States v. Lopez*, No. 05-50415, 2007 WL 1309689 (9th Cir. May 7, 2007) (en banc), and 8 U.S.C. § 1234(a)(1)(A)(v)(i), the BIA concluded

that "it does not necessarily matter here whether the brother had actually crossed into the United States when [Urzua] first agreed to pay the smuggler." Therefore, notwithstanding the IJ's "reasonable person" language, the BIA found that Urzua knowingly encouraged, induced, assisted, abetted or aided Louis to unlawfully enter the United States.

## II

We have jurisdiction to review the BIA's denial of eligibility for suspension of deportation based on a finding that petitioner is statutorily barred from showing good moral character. *See* 8 U.S.C. § 1105a(a) (Supp. II 1996), amended by IIRIRA § 309(c)(4)(E), 110 Stat. 3009-626; *Kalaw v. INS*, 133 F.3d 1147, 1151 (9th Cir. 1997). Whether Urzua falls into one of the per se categories listed in § 1101(f) presents a question of fact that we review for substantial evidence. *Id.*

Urzua carries the burden to prove that he meets the statutory requirements for suspension of deportation and that he merits a favorable exercise of discretion. *Ordonez v. INS*, 137 F.3d 1120, 1123 (9th Cir. 1998). "To reverse the BIA['s] finding[,] we [would have to] find that the evidence not only *supports* that conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1.

## III

On appeal, Urzua contends that substantial evidence does not support the BIA's finding that he "knowingly" aided or abetted Louis in unlawfully entering the United States because, at the time he agreed to give Louis the $1200 smuggling fee, he did not know whether his brother had already crossed the border and entered the United States, and one cannot aid or abet in a completed offense.[2] Urzua bases his argu-

---

[2]Urzua contends that the IJ failed to properly define the term "knowingly," and that this is evidenced by the fact that the IJ found that "a reason-

ment on the premise that alien smuggling ends once the alien crosses the border. That is not the case. In light of our recent en banc decision in *United States v. Lopez*, No. 05-50415, 2007 WL 1309689 (9th Cir. May 7, 2007), where we addressed the criminal alien smuggling statute in 8 U.S.C. § 1324(a)(2) (2000), we now hold that alien smuggling as defined in 8 U.S.C. § 1182(a)(6)(E)(i) also continues until the initial transporter who brings the aliens to the United States ceases to transport the aliens.

**[1]** *Lopez* declared that the "brings to" offense in § 1324(a)(2)[3] is a continuing offense that does not end once each element of the crime has occurred. *Lopez*, 2007 WL 1309689, at *1. We reasoned that the "brings to" offense "proscribes an act that is not a static or an instantaneous occurrence, geographically or temporally." *Id.*, at *5. It "requires transporting [aliens] over a period of time and distance and thus does not occur at one particular moment or location." *Id.* Moreover, the federal venue statute, 18 U.S.C. § 3237 (2000), provides that

> [a]ny offense involving . . . transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and . . . may be inquired of and prosecuted in any district from, through, or into which such commerce . . . or imported object or person moves.

---

able person in [Urzua's] circumstances would conclude that the brother was attempting an illegal entry into the United States and [Urzua] was aware that the money was to be used for the smuggling fee." However, when the BIA conducts a de novo review and issues its own decision, we review the BIA's decision rather than the IJ's. *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 679 (9th Cir. 2005).

[3]"Any person who, knowing or in reckless disregard of the fact that an alien had not received prior official authorization to come to . . . the United States, brings to or attempts to bring to the United States in any manner whatsoever" is guilty of the "brings to" offense. *Id.*

In other words, any offense involving the importation of a person or object into the United States is a continuing offense for venue purposes. *See Lopez*, 2007 WL 1309689, at *6.

[2] We have no reason to define the alien smuggling provision set forth in § 1182(a)(6)(E)(i) differently from its criminal counterpart in § 1324(a)(2). As we stated in *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674 (9th Cir. 2005),[4] Congress intended the civil alien smuggling statute to apply to a broad range of conduct.[5] *Id.* at 679. There, we held that "[a]n individual may knowingly encourage, induce, assist, abet, or aid with illegal entry, even if he did not personally hire the smuggler and even if he is not present at the point of illegal entry." *Id.*; *see also Soriano v. Gonzales*, 2007 WL 1020462, *2 (5th Cir. April 5, 2007) (citing *Hernandez-Guadarrama* and holding that an alien is inadmissible under § 1182 "regardless of whether the assisting individual was present at the border crossing").[6] And, similar to the criminal "brings to" offense, the civil alien smuggling provision in § 1182 does not describe acts that constitute static or instantaneous occurrences. Rather, these are acts that occur over a period of time and distance, and do not occur at one particular moment or location. *See Lopez*, 2007 WL 1309689, at *5. Therefore, we

---

[4]*Hernandez-Guardarrama* discussed 8 U.S.C. § 1227(a)(1)(E)(i) rather than § 1182(a)(6)(E)(i). However, as the Supreme Court has made clear, identical words used in different parts of the same act are intended to have the same meaning. *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990).

[5]Under § 1227(a)(1)(E)(i), "[a]ny alien who . . . knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable."

[6]There is no basis to distinguish these two statutes through their mens rea requirement. *See* 8 U.S.C. § 1324(a)(2) (requiring a mens rea of "knowing or in reckless disregard"); *Id.* § 1182(a)(6)(E)(i) (stating a mens rea requirement of "knowingly"). We are concerned with the scope of the alien smuggling provisions, not with an offender's mental state when committing the offense. Our holding that § 1182(a)(6)(E)(i) is a continuing offense does not affect the civil provision's mens rea requirement of "knowingly."

hold here that alien smuggling under § 1182 continues until the initial transporter ceases to transport the alien.

**[3]** Given the broad scope of the statute, we simply cannot say that the evidence in this record compels a result contrary to that reached by the IJ and the BIA. During the October 26, 2000, hearing, Urzua admitted that he knew his brother had planned on crossing the border illegally, and that, along with other members of his family, he had "helped [Louis] out, paying his crossing." Even if Urzua had not agreed to pay the smuggler until after his brother had crossed the border, the evidence shows that Urzua agreed to pay before the "initial transporter" ceased transporting Louis. Therefore, Urzua's participation took place prior to the completion of the alien smuggling venture. Moreover, by collecting the needed money from his siblings and arranging payment to the smuggler, Urzua knowingly aided and abetted the venture by providing "an affirmative act of help, assistance, or encouragement" in his brother's effort to illegally enter the United States. *See Altamirano v. Gonzales*, 427 F.3d 586, 592 (9th Cir. 2005); *see also Khourassany v. INS*, 208 F.3d 1096, 1101 (9th Cir. 2000) (upholding the IJ's and BIA's finding that petitioner fell within the alien smuggler provision because "he admitted that in 1995 he paid a smuggler to bring his wife and child into the United States illegally from Mexico").

IV

**[4]** The BIA did not abuse its discretion by failing to comply with the procedural safeguards set forth in *Matter of J*, 2 I&N Dec. 286, 1945 WL 5557 (BIA 1945), for obtaining admissions. *See Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1215 (9th Cir. 2002) (stating that we review the BIA's interpretation of its case law for an abuse of discretion). Those procedural safeguards "[were] adopted for the purpose of insuring that the alien would receive fair play and to preclude any possible later claim . . . that he had been unwittingly entrapped

into admitting the commission of a crime involving moral turpitude." *Matter of K*, 7 I&N Dec. 594, 597, 1957 WL 10581 (BIA 1957). Here, Urzua was being questioned under oath, in the presence of his attorney. Moreover, the BIA did not find that Urzua had admitted to committing acts constituting the essential elements of a crime involving moral turpitude. Rather, the BIA concluded that Urzua was statutorily ineligible to prove good moral character because he had engaged in alien smuggling under § 1182(a)(6)(E)(i). The record supports that factual finding.

**PETITION DENIED.**

---

PREGERSON, Circuit Judge, Dissenting:

I disagree with the majority's characterization of the facts in this case. The evidence in the record compels a result contrary to the BIA's holding. Accordingly, I dissent.

Urzua is a citizen of Mexico. He has been residing in the United States since he entered the country illegally in 1989. The INS commenced deportation proceedings against Urzua in 1997. Urzua conceded deportability, but applied for suspension of deportation. To qualify for the discretionary relief of suspension of deportation Urzua must (1) have been physically present in the United States for a continuous period of seven years, (2) be a person of good moral character, and (3) demonstrate that deportation would result in extreme hardship to himself or to his U.S. citizen son. 8 U.S.C. § 1254(a)(1).[1]

---

[1]Under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress eliminated suspension of deportation, INA § 212(c). Congress replaced it with "cancellation of removal," INA § 240A; 8 U.S.C. § 1229b , which retained similar standards for relief. *See Pablo v. INS*, 72 F.3d 110, 113 (9th Cir. 1995).

There is no dispute that Urzua has met the requirements of continuous presence and extreme hardship to himself and to his son. Urzua has been in the United States for almost eighteen years. During this time, Urzua has worked for the same employer and has paid taxes. He learned English and is active in his church and in his community. He and his brother own a house together. Urzua coaches a children's soccer team, and he is very close to his extensive family residing in California, including four siblings, aunts, uncles, nieces, nephews, and cousins.

Urzua also plays an important role in the life of his eleven-year-old U.S.-born citizen son whom he supports emotionally and financially. Although his son does not live with him, Urzua spends part of nearly every day with his son, provides him with medical insurance, and pays child support.

Despite Urzua's upstanding background, the BIA found Urzua ineligible for suspension of deportation on the grounds that Urzua lacks "good moral character." Under section 101(f)(3) of the Immigration and Nationality Act, a person lacks good moral character if that person is described in section 212(a)(6)(E). That section provides, in part, that an alien who "knowingly has encouraged, induced, assisted, abetted or aided any other alien to enter or to try to enter the United States in violation of the law is inadmissible." 8 U.S.C. § 1182(a)(6)(E)

The BIA held that section 212(a)(6)(E) applied to Urzua. The BIA held that the evidence demonstrated that Urzua "executed a step-by-step plan to help his brother illegally enter . . . the United States." This conclusion is not supported by the evidence.

The BIA relied on *Matter of I-M-*, 7 I&N Dec. 389 (BIA 1957), in determining that Urzua had executed a step-by-step plan to help his brother Louis enter the United States illegally. In *Matter of I-M-*, the BIA found that a person who drove ille-

gal aliens (who were already in the United States) to Los Angeles was not subject to deportation. The transporter did not know the aliens beforehand, and the transportation was not prearranged. *Matter of I-M-*, 7 I&N at 391. The BIA in *Matter of I-M-* explained,

> in all cases where we have ordered deportation [based on alien smuggling,] the record shows that the respondent knew the assisted aliens beforehand, or contacted them while they were still in Mexico, or knew a go-between who was arranging their entry and there was some conversation or prearrangement prior to the assisted alien's entry.

*Id.*

Guided by the above statement from *Matter of I-M-*, the BIA held Urzua to be an alien smuggler. The BIA explained that Urzua (1) knew his brother Louis beforehand, (2) knew Louis wished to cross illegally, (3) discussed illegal crossing with Louis, (4) arranged payment to the smuggler, (5) agreed to a meeting place with the smuggler, and (6) presented the money to the smuggler.

The BIA's characterization of the facts is not supported by the evidence. "Absent an explicit adverse credibility finding, a witness's testimony must be accepted as true." *Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 851 (9th Cir. 2004).[2] Although Urzua, of course, knew his brother beforehand and knew that his brother wished to cross illegally, Urzua vehemently discouraged his brother from crossing. Urzua did not offer assistance with the illegal crossing; in fact, Urzua told Louis *not* to do it. Urzua did not know that Louis was going to go against his advice and enter illegally until Louis was already on his way to Los Angeles. Urzua's upset mother cal-

---

[2]Not only did the IJ find Urzua credible, but she praised him for his honesty.

led him from Jalisco, Mexico stating that Louis had decided
to travel to the United States illegally and was on his way to
Urzua. She expressed her worry over Louis.

Louis later called Urzua from "Nogales" stating he was on
his way to Urzua and asking to borrow $1,200. Urzua did not
ask Louis what the money was for or how Louis was coming
to Los Angeles. Additionally, Urzua did not determine
whether Louis was in Nogales, Mexico or Nogales, Arizona.
Urzua was worried for his brother's safety and agreed to lend
him the money he requested. Urzua pooled some of his
money with money from another sibling. Although Urzua sus-
pected that some of the money might go to a smuggler, this
was not "arranging" payment.

As for the meeting place and presentation of money, the
circumstances do not demonstrate that Urzua planned or coor-
dinated a step-by-step program to help his brother enter the
United States illegally. When Louis reached Los Angeles, he
called Urzua and announced "I'm Here." Urzua asked Louis
where he was. At that point, a stranger took the phone and
told Urzua that his brother was in the parking lot at a nearby
Wal-Mart. That stranger also told Urzua that he should bring
the money for his brother to the Wal-Mart and he should go
alone. Urzua went to the Wal-Mart. He parked his car and
then looked around for his brother, whom he did not see. A
stranger approached Urzua and asked if he was Louis's
brother. Urzua asked to see his brother. Louis then got out of
a car. After ensuring that Louis was unharmed, Urzua gave
the money to Louis who then used the money to pay the
stranger. Urzua and Louis then left. Urzua never confirmed
that the stranger was a smuggler. Urzua had not seen him
before, and he never saw him again. Urzua did not know the
man, and he never even learned the stranger's name. He did
not make any arrangements with the smuggler. Urzua's only
interaction with the smuggler was to learn his brother's loca-
tion in Los Angeles.

Urzua did not plan or execute the smuggling of his brother. Urzua testified that at all times, he was solely concerned for Louis's safety. This is not evidence of Urzua executing a "step-by-step plan" to smuggle Louis into the United States. This is an older brother protecting a younger brother whom the family believed to be in danger.

Urzua's actions further do not constitute aiding and abetting alien smuggling because the actions occurred *after* Louis had entered the country. By the time Urzua loaned Louis money, Louis was in Los Angeles. It is not even clear whether Louis was in the United States or Mexico when Urzua agreed over the telephone to loan Louis money.

In *United States v. Lopez*, ___ F.3d ___, 2007 WL 1309689 (9th Cir. 2007) (en banc), we recently held that the offense of smuggling an alien "to" the United States terminates when the person transporting the alien brings the alien to a destination within the United States. From the record, we can not determine when the crime was complete. If Louis called Urzua from Nogales, Arizona, the crime of alien smuggling was already completed at the time Urzua agreed to lend his brother money. In such a situation, Urzua would, at most, be guilty of accessory after the fact to alien transportation. If a smuggler transported Louis from Nogales, Mexico to the Wal-Mart parking lot in Los Angeles, the crime was completed upon reaching the parking lot — before Louis called his brother to come meet him.

Urzua's agreement to lend his brother money is insufficient to demonstrate that Urzua aided and abetted alien smuggling. Regardless of which side of the border Louis was standing on when asking his brother to lend him $1200, there is no substantial evidence that Urzua "willingly associated himself with the venture and participated therein as something he wished to bring about." *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980) (interpreting the federal aiding and abetting statute). The Ninth Circuit Model Criminal Jury

Instructions explain that to be found guilty of aiding and abetting, a defendant must have "knowingly and intentionally" assisted in committing each element of the principal's offense. Ninth Circuit Model Criminal Jury Instructions § 5.1 (2005); *see also Lopez*, 2007 WL 1309689 at *11. The evidence here does not indicate that Urzua assisted in the formation of the underlying plan or in the commission of the act.

Urzua reluctantly agreed to lend his brother money out of concern for his brother's safety. He did so despite the fact that he suspected the money would be used to pay an alien smuggler. Lending someone money, even where you suspect it will be used to pay for illegal activities, does not (without more) rise to the level of aiding and abetting the principal's crime. This is especially true where the money is lent after completion of the crime to pay off a debt. Would we consider loaning a brother money to pay off an illegal gambling debt to be aiding and abetting in the crime of illegal gambling? At most, such circumstances describe actions akin to accessory after the fact.

As Urzua testified, there was nothing he was able to say or do to prevent his brother's illegal entry. Urzua did not arrange for Louis to enter the country illegally. He did not coordinate with a smuggler or with Louis. He did not execute a step-by-step plan. Indeed, there is no evidence that Urzua knew anything of his brother's plans before Louis called begging for money. For the foregoing reasons, I dissent. I would grant Urzua's petition.