**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-1062**

_____

BENJAMIN SANDOVAL DIAZ,

Petitioner,

v.

TODD BLANCHE, Acting U.S. Attorney General,

Respondent.

_____

On Petition for Review of an Order of the Board of Immigration Appeals.

_____

Argued:  January 29, 2026                                          Decided:  April 20, 2026

_____

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

_____

Petition for review denied by published opinion.  Judge King wrote the opinion, in which Judge Niemeyer joined.  Judge Harris wrote a dissenting opinion.

_____

**ARGUED:**  Rebekah Goncarvos Grafton, FAY GRAFTON NUNEZ, PLLC, Raleigh, North Carolina, for Petitioner.  Mohammed Samer Budeir, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Ana S. Nunez, FAY GRAFTON NUNEZ, PLLC, Raleigh, North Carolina, for Petitioner.  Brian Boynton, Principal Deputy Assistant Attorney General, Melissa K. Lott, Virginia L. Gordon, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

KING, Circuit Judge:

Petitioner Benjamin Sandoval Diaz seeks review of a 2023 decision of the Board of Immigration Appeals (the "BIA Decision"), which affirmed an Immigration Judge's 2019 denial of Diaz's application for cancellation of removal (the "IJ Decision"). The IJ Decision and the BIA Decision each concluded that Diaz was not entitled to relief because he failed to sustain his burden of proving that he satisfies the "good moral character" requirement for a cancellation of removal. And that was so because Diaz testified — under oath and represented by counsel — to separate North Carolina crimes of possession, sale, and delivery of cocaine. Diaz thus committed felony drug offenses that contravene North Carolina General Statute § 90-95(a)(1) (hereinafter the "N.C. Drug Law").

By his petition for review, Diaz contends that the BIA Decision erred in declining to vacate the IJ Decision, in that the IJ failed to apply BIA precedent — specifically a 1957 BIA decision called *Matter of K-*, 7 I&N Dec. 594 (BIA 1957) (hereinafter "*Matter of K*"). Diaz also maintains that both the IJ Decision and the BIA Decision erroneously ruled that his testimony before the IJ satisfy the elements of the N.C. Drug Law under which Diaz had been indicted. As explained herein, we deny Diaz's petition for review.

I.

A.

Petitioner Diaz, a native and citizen of Mexico, unlawfully entered the United States nearly 30 years ago, in 1997. On January 14, 2015, Diaz was arrested in Wake County, North Carolina, and charged with three felony drug offenses under the N.C. Drug Law.

2

That is, he was charged with (1) possession of cocaine with intent to deliver, (2) sale of cocaine, and (3) delivery of cocaine. On May 18, 2015, a grand jury in Wake County indicted Diaz for each of those offenses. Diaz was never tried or convicted, however, because the North Carolina prosecutors dismissed all three charges on July 5, 2017, in exchange for Diaz's cooperation against several others involved in controlled substance offenses.

On March 13, 2015, while Diaz's felony drug offenses were pending in Wake County, the Department of Homeland Security (the "DHS") initiated removal proceedings against him. The DHS charged Diaz with being an inadmissible noncitizen, and thus subject to removal under 8 U.S.C. § 1182(a)(6)(A)(i). *See* 8 U.S.C. § 1182(a)(6)(A)(i) (providing that "[a]n alien present in the United States without being admitted or paroled . . . is inadmissible"). On August 28, 2015, Diaz's lawyer filed pleadings that included an explicit concession of the proposition that Diaz was removable as alleged.

Soon thereafter, in November 2015, Diaz filed an application for cancellation of removal, pursuant to 8 U.S.C. § 1229b(b). *See* 8 U.S.C. § 1229b(b) (providing for "[c]ancellation of removal and adjustment of status for certain nonpermanent residents"). The IJ presiding over Diaz's removal proceedings then conducted hearings in Charlotte and — nearly four years later in July 2019 — denied Diaz's application for cancellation of removal.

B.

The initial IJ proceeding was convened on September 23, 2015, prior to the filing of Diaz's November 2015 application for cancellation of removal, but after the DHS had

3

charged Diaz with removability in May 2015.  The IJ thereafter postponed further hearings on at least four occasions due to the pendency of Diaz's criminal charges in Wake County.  The first IJ hearing relevant to this appeal was initiated on April 18, 2018, after Diaz's felony drug offenses were dismissed in Wake County.  Both Diaz and his wife testified at that IJ hearing.  An additional part of the IJ hearing was conducted on August 8, 2018.

At the outset of Diaz's IJ hearing on April 18, the IJ explained to Diaz's lawyer that his "usual practice [was] to ask a lot of the questions on direct and then turn it over to . . . counsel," but that if the lawyer "would like to conduct the direct examination, that is [her] prerogative."  *See* J.A. 102.[1]  Diaz's lawyer responded that, "if you want to ask the questions that you'd like to, that's fine with me."  *Id.*  Before any examination of Diaz occurred, the IJ also advised Diaz's lawyer that "any time you have any objections to a question, or you need to inject a question for clarity, feel free to go ahead and do that."  *Id.* (citation modified).

Diaz then testified before the IJ in support of his application for cancellation of removal.  During his testimony, Diaz explained that, although he had illegally entered the United States in 1997, he was self-employed, married to a U.S. citizen, and supported three citizen children and stepchildren.  Concerning the children, Diaz and his wife each testified about their family, and they both emphasized the hardships the children would face if Diaz was removed from the United States.  Diaz also answered questions regarding his criminal

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

history. He acknowledged that, in 2001 and 2007, he had been arrested for fighting at nightclubs. Each of those arrests involved an assault on a police officer. And he confirmed having two arrests for driving while impaired, both in 2006.

The three dismissed felony drug charges in Wake County — felony possession, sale, and delivery of cocaine — warranted more extensive testimony. To that end, Diaz admitted to the IJ that, on August 29, 2014, while he was fixing a vehicle owned by a man nicknamed "300," a neighborhood security guard named "Milton" arrived near the vehicle and struck up a conversation with 300. During that conversation, Milton apparently learned that 300 was involved in selling drugs.

Diaz also admitted that, after that encounter, Milton called Diaz several times a day and asked him to contact 300, seeking drugs that would be for Milton. Diaz said that Milton called because Diaz had 300's phone number, while Milton did not. Diaz acknowledged that, although he had initially refused Milton's requests about obtaining drugs for Milton from 300, Diaz finally relented. As a result, Diaz contacted 300, who agreed to deliver drugs to Diaz, for Diaz's delivery to Milton. The IJ's direct examination fleshed out Diaz's admissions about his involvement with cocaine:

Q:    Did you ever procure any cocaine?

A:    No. Only that one day.

Q:    Did you ever obtain any cocaine, possess it, sell it, or deliver it to another person?

A:    Only that time.

Q:    How much cocaine did you obtain?

5

A:    It was 3 and a half grams.

*See* J.A. 120.  Diaz then explained that 300 had delivered 3-and-a-half grams of cocaine to him, and that Diaz had kept the cocaine in his vehicle for about four hours.  When Milton arrived with another man after the four-hour delay, Diaz sold the cocaine to Milton.  The person accompanying Milton — to Diaz's surprise — turned out to be an undercover police officer.  As a result, Diaz was arrested and indicted for the three felony drug offenses in Wake County.

In addition to admitting before the IJ the facts underlying the felony drug offenses alleged in his indictment, Diaz acknowledged to the IJ that he had used cocaine "once in a while" before his arrest.  *See* J.A. 122.  Notably, Diaz's lawyer was present during all of Diaz's testimony before the IJ, and the lawyer did not object in any respect.

After the testimony of Diaz and his wife, the IJ hearing was delayed pending a follow-up hearing.  Through issuance of a subpoena, the IJ secured several documents from the Wake County District Attorney concerning Diaz's felony drug offenses and his cooperation with law enforcement authorities that had led to the dismissal of those charges. The documents secured included a so-called "CONTRACT," dated March 8, 2017, that had been agreed to between Diaz and the District Attorney.  *See* J.A. 205.  Pursuant thereto, the three felony drug offenses alleged against Diaz in the indictment were dismissed. Additionally, the documents obtained from the District Attorney included a "DISMISSAL," dated July 5, 2017, which confirmed that Diaz had satisfied his contractual obligations to the prosecutors.  *Id.* at 208.  Those Wake County documents were filed by the IJ in the administrative record of these proceedings.  *See* J.A. 205-26.

6

The IJ hearing resumed about four months later, on August 8, 2018, and it was conducted in order for Diaz to "explain some of the issues raised" by the documents obtained by the IJ from the Wake County District Attorney. *See* J.A. 181. The IJ then made several clarifying inquiries of Diaz about the three felony drug offenses. In response, Diaz once again confessed to the IJ his involvement in committing those felony drug offenses. Again, Diaz's lawyer did not object to any of those inquiries.

## C.

### 1.

On July 8, 2019, the IJ Decision denied Diaz's application for cancellation of removal, and thus ordered his removal to Mexico. In sum, the IJ ruled therein that Diaz was statutorily barred from receiving a cancellation of removal from the Attorney General because he had committed felony offenses that precluded any ruling that he was of a "good moral character," as required by 8 U.S.C. § 1101(f)(3). More specifically, the IJ Decision assessed the testimony of Diaz and "[found] that [Diaz] sufficiently admitted to committing the offenses for which the Grand Jury indicted him." *See* IJ Decision 4. And the IJ explained that Diaz had also admitted consuming cocaine "once in a while" prior to his 2015 arrest, and that the IJ had identified evidence in the record that corroborated Diaz's various admissions. *Id*.

### 2.

Next, the IJ Decision addressed the 1957 BIA decision called *Matter of K*, which forms a foundation of Diaz's appeal. The *Matter of K* decision established certain procedural safeguards for use by IJs, which were designed to prevent a noncitizen from

7

being "unwittingly entrapped into admitting the commission of a crime." *See Matter of K* 597. As the BIA recited in *Matter of K*, in order to ensure "fair play" in immigration proceedings, a noncitizen should "be given an adequate definition of the crime, including all essential elements . . . explained in understandable terms." *Id.*

The IJ Decision of July 2019 ruled that the procedural safeguards of *Matter of K* were satisfied in this situation, primarily because Diaz had "testified voluntarily, under oath, and in the presence of his attorney." *See* IJ Decision 5. The IJ Decision also ruled that Diaz had not been "unwittingly entrapped into admitting" facts that rendered him statutorily ineligible from being awarded a cancellation of removal. *Id.* Importantly, the IJ Decision distinguished the *Matter of K* situation from what it called "the instant case," because the *Matter of K* proceedings "considered admissions . . . [made] in the context of removability, not eligibility for relief." *Id.* at 4 n.4. In this situation — as the IJ Decision emphasized — "[Diaz] ha[d] the burden to establish his own eligibility for relief from removal." *Id.* And the IJ Decision further emphasized that the IJ was taking "this shift in burden into account when considering how the *Matter of K* analysis applies to [Diaz's] case in ensuring he was not 'unwittingly entrapped into admitting' to a crime." *Id.*

Finally, the IJ Decision emphasized and ruled that Diaz had admitted committing each of the three felony drug offenses for which he was charged, in violation of the N.C. Drug Law. The IJ Decision also explained that the N.C. Drug Law "relat[es] to a controlled

8

substance as defined in section 102 of the Controlled Substances Act."[2] *See* IJ Decision 5.

Thus, according to the IJ Decision, Diaz "failed to demonstrate he is statutorily eligible for cancellation of removal." *Id.* As a result, the IJ Decision ruled that it was unnecessary and irrelevant for the IJ to either reach or "decide whether [Diaz's] removal from the United States would constitute an exceptional and extremely unusual hardship to his qualifying relatives." *Id.*

### D.

On August 6, 2019, Diaz timely appealed the IJ Decision to the BIA, arguing, inter alia, that (1) the IJ's failure to adhere to the *Matter of K* decision required a reversal of the IJ Decision, and (2) the evidence presented in the IJ hearing failed to establish that Diaz had violated the N.C. Drug Law. On December 21, 2023, the BIA Decision dismissed Diaz's appeal.

### 1.

In disposing of Diaz's appeal, the BIA Decision first determined that Diaz's admissions before the IJ to having committed three felony drug offenses in North Carolina were valid. As a result, the BIA Decision also concluded that *Matter of K* was materially distinguishable, and thus did not require a reversal of the IJ Decision, because "[*Matter of K*] involved the reliance in immigration proceedings of unsworn statements made out of

---

[2] The Controlled Substances Act of 1970, codified at 21 U.S.C. § 801 *et seq.*, defines cocaine as a "narcotic drug." *See* 21 U.S.C. § 802(17)(D). In addition, the Act identifies cocaine as a "Schedule II" controlled substance. *See id.* § 812. And that means that cocaine "has a high potential for abuse." *Id.*

9

court to a police officer admitting facts used to charge [a noncitizen] with a crime." *See* BIA Decision 2. In that regard, the BIA Decision recognized that Diaz's situation — as presented to the IJ — was also distinguishable because it "involves [Diaz's] in-court testimony, made under oath, offered in the course of applying for cancellation of removal." *Id.* The BIA Decision thus deemed it significant that, in *Matter of K*, "the [noncitizen's] admissions were being considered in reference to establishing his deportability." *Id.* In Diaz's situation, however, it was deemed important that "[Diaz's] admissions were made in the context of establishing his eligibility for [cancellation of removal], which [was] his burden to prove." *Id.*

Put simply, the BIA Decision recognized that the safeguards of *Matter of K* had been adopted in 1957 to ensure that noncitizens receive "fair play" from the authorities and thus to prevent what the BIA called an "unwitting entrapment." *See* BIA Decision 2 (citation modified). But the BIA Decision emphasized that Diaz "was represented by counsel at his individual hearing," and his lawyer had "confirmed that the [IJ] could ask him questions." *Id.* Diaz's lawyer was also entitled to "raise an objection to any question asked," and Diaz was thus not in any way "unwittingly entrapped into his admission[s]." *Id.* And the BIA Decision further emphasized that Diaz's various admissions to the felony drug offenses during the IJ hearings were valid.

2.

The BIA Decision then turned to Diaz's contention that his testimony before the IJ failed to satisfy the elements of the felony drug offenses, as defined in the N.C. Drug Law. In rejecting that contention, the BIA Decision emphasized that the IJ had questioned Diaz

10

concerning whether he "ever obtained, possessed, sold, or delivered to another the substance of cocaine." *See* BIA Decision 2-3. And Diaz had responded, "only that time." *Id.* at 3. The BIA Decision also recognized that Diaz had "explain[ed] that the quantity [of cocaine] was 3.5 grams and that he obtained it from a man who brought it to his house." *Id.* Finally, the BIA Decision recognized that Diaz also admitted, under oath and in the presence of his lawyer, that he sold cocaine to the man named Milton, who had arrived with the undercover policeman.

In assessing Diaz's contention that "he did not admit to the essential elements [of the N.C. Drug Law] . . . because he did not admit to knowing the substance he possessed and sold was in fact cocaine," the BIA was not at all persuaded. *See* BIA Decision 3. Relying on North Carolina precedent — i.e., a decision called *State v. Boone*, 311 S.E.2d 552, 558 (N.C. 1984) — the BIA Decision emphasized that Diaz had not "contest[ed] the identity of the substance when he admitted to having committed the controlled substance offense violation." *Id.*

At bottom, the BIA Decision upheld the IJ Decision, ruling that Diaz's admissions before the IJ "necessarily preclude him from demonstrating good moral character." *See* BIA Decision 3. Diaz's appeal of the IJ Decision to the BIA was thus dismissed.

## II.

When the BIA "has adopted or supplemented an IJ's decision, we review both decisions." *See Kouyate v. Garland*, 122 F.4th 132, 139 (4th Cir. 2024). Purely legal questions, such as whether the BIA has adhered to precedent, are reviewed de novo. *See*

11

*Portillo Flores v. Garland*, 3 F.4th 615, 625 (4th Cir. 2021). And when the BIA renders a decision on a legally erroneous ground, it has abused its discretion. *Id.* at 629.

A noncitizen applicant for cancellation of removal bears "the burden of proof to establish" that he "satisfies the applicable eligibility requirements." *See* 8 U.S.C. 1229a(c)(4)(A)(i). And since the good moral character analysis conducted pursuant to an application for cancellation of removal is "essentially a legal determination involving the application of law to factual findings," *see Jean v. Gonzales*, 435 F.3d 475, 482 (4th Cir. 2006), we review such an issue as a mixed question of law and fact. *See Cortes v. Garland*, 105 F.4th 124, 133 (4th Cir. 2024). Our Court has recently deemed it "unnecessary" to apply a specific standard of review in a situation where, "whether we apply de novo or abuse-of-discretion review," the ultimate disposition of the appeal does not change. *See Martinez-Martinez v. Bondi*, 157 F.4th 605, 609 (4th Cir. 2025) (quoting *Cortes*, 105 F.4th at 134). In this situation, regardless of the standard of review applied, the result is the same — Diaz's petition for review should be denied.

## III.

### A.

Before addressing the contentions of Diaz, we will briefly explain the statutory framework governing cancellation of removal issues. First, a noncitizen who is otherwise removable may have his removal cancelled at the discretion of the Attorney General. *See* 8 U.S.C. § 1229b(b)(1). To be eligible for such a cancellation, however, petitioner Diaz must satisfy four statutory criteria. *Id.* That is, Diaz must establish — and he has the

12

burden of proving — that: (1) he "has been physically present in the United States for a continuous period of not less than 10 years" immediately preceding the date he applied for cancellation, (2) that he "has been a person of *good moral character during such period*," (3) that he has not committed one of certain enumerated criminal offenses, and (4) that "his removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States." *Id.* (citation modified).

In these proceedings, the second statutory criterion — that is, the "good moral character" requirement — mandates a "reference to the general definition provision of the Immigration and Nationality Act, which establishes a number of *per se* categories that, if applicable, bar a noncitizen from establishing 'good moral character.'" *See Jean v. Gonzales*, 435 F.3d 475, 482 (4th Cir. 2006) (citation modified); *see* 8 U.S.C. § 1101(f). Of great importance here, a noncitizen applicant for cancellation of removal cannot be "regarded as a person of good moral character" if he is a "person[] . . . described in [8 U.S.C. § 1182(a)(2)(A)(i)(II)]." *See* 8 U.S.C. § 1101(f)(3). That provision states that a noncitizen

> convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a violation of . . . any law or regulation of a State . . . relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible.

*See* 8 U.S.C. § 1182(a)(2)(A)(i)(II). A controlled substance, as defined in 21 U.S.C. § 802, is "a drug or other substance" included in, inter alia, "Schedule II." And cocaine is a controlled substance under Schedule II.

13

Pursuant to the foregoing, a noncitizen applicant for cancellation of removal — such as Diaz — who has admitted to the essential elements of multiple violations of law concerning cocaine — is statutorily barred from having his removal cancelled by the Attorney General. Diaz contends, however, that the IJ erred because *Matter of K* required the IJ to explain — in understandable terms before Diaz testified — that: "it is unlawful for any person to manufacture, sell or deliver, or possess with the intent to manufacture, sell or deliver, a controlled substance." *See* N.C. Drug Law (citation modified). Alternatively, Diaz contends that, even if his admissions of the felony drug offenses were properly accepted by the IJ and the BIA, the elements of the N.C. Drug Law offenses were not established, because the evidence failed to prove that the substance he had possessed, sold, and delivered to Milton was actually cocaine. We will address those contentions in turn.

B.

1.

In its 1957 decision in *Matter of K* the BIA ruled that noncitizen "K's" admissions to committing a rape offense were invalid because *K* had never been properly advised of the essential elements of the rape offense. *See Matter of K* 594. Noncitizen K — being questioned by a police officer — had "signed a statement" which established that he had committed a rape offense under state law. *Id* at 595. The BIA ruled, however, that those rape admissions could not be used against noncitizen K because a "valid admission of a crime for immigration purposes requires that the noncitizen be given an adequate definition of the crime, including all essential elements, and that it be explained in understandable

14

terms." *Id.* at 597. As we explained heretofore, the rule established by the *Matter of K*

decision was deemed necessary to ensure that a noncitizen "would receive fair play." *Id.*

And the BIA believed that its *Matter of K* decision would ensure that such noncitizens

would not be "unwittingly entrapped" into admissions of crimes that carried adverse

immigration consequences. *Id.*

Here, Diaz's proceedings before both the IJ and the BIA readily present material

distinctions from the situation that existed in *Matter of K*. Those distinctions — recognized

by the IJ and the BIA — include the following:

- Burden of Proof: The immigration proceedings in Diaz's situation are materially distinguishable from *Matter of K* because Diaz bore the burden of proof to establish his eligibility for cancellation of removal. *Matter of K* was a removability proceeding where the Immigration and Naturalization Service — rather than noncitizen K — had the burden of proof.[3]

- Assistance of Counsel: Diaz's situation in these proceedings is materially distinguishable from *Matter of K* because, at the time of his relevant admissions, Diaz was represented by his own lawyer. Noncitizen K, on the other hand, was not represented by counsel.

- Testimony of Diaz was Voluntary and Under Oath: Diaz's situation is materially distinguishable because he testified voluntarily and under oath before the IJ. Noncitizen K, on the other hand, had given an out-of-court unsworn written statement to a police officer.

- Procedural Safeguards: Diaz's situation is further distinguishable because his lawyer was always present and entitled to object to questions posed by the IJ. And Diaz's lawyer could also have examined Diaz directly.

---

[3] Congress established the DHS in 2002. *See* Homeland Security Act of 2002, Pub. L. No. 107-296 (codified at 6 U.S.C. § 101 *et seq.*). That Act terminated the Immigration and Naturalization Service and transferred its functions to the DHS. *See* 6 U.S.C. § 291.

15

As the BIA Decision explained, and consistent with the various material distinctions explained above, Diaz's circumstances fail to implicate the "fair play" and "unwitting entrapment" concerns identified by *Matter of K*. *See Matter of K* 597. The BIA Decision recognized that "[the BIA] in *Matter of K* considered admissions in reference to establishing his deportability." *See* BIA Decision 2. Diaz's admissions, however, "were made in the context of establishing his eligibility for the relief sought, which [was] his burden to prove." *Id*. And that is not at all an empty distinction. Diaz voluntarily conceded his removability, which otherwise would have been for the DHS to prove. *See Mauricio-Vasquez v. Whitaker*, 910 F.3d 134, 140 (4th Cir. 2018) (explaining that DHS "[bears] the burden of proving every element of . . . removability . . . by clear and convincing evidence"); *cf. Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) (recognizing that it is "a noncitizen's burden of proof to show eligibility for cancellation of removal"). In these circumstances, Diaz is unable to show that he was either unwittingly entrapped or did not receive "fair play." We therefore reject this contention and rule that *Matter of K* is inapplicable here.[4]

### 2.

In his alternative contention, Diaz maintains that his testimony before the IJ did not constitute any admissions about cocaine actually being involved in the felony drug offenses

---

[4] Our approach — i.e., that admissions by a noncitizen before an IJ are valid when made under oath, with his lawyer present, where the witness has the burden of proof — finds support in a sister court of appeals. *See Urzua Covarrubias v. Gonzales*, 487 F.3d 742, 749 (9th Cir. 2007) (recognizing that *Matter of K* does not apply when the noncitizen applicant is "questioned under oath, in the presence of his attorney").

with which he was charged. That is so, he contends, because "he did not admit to the identity of the substance" involved. *See* Br. of Appellant 21. He also asserts that a chemical analysis should have been required and admitted into evidence in order to prove that he had been involved with the possession, sale, or delivery of cocaine.

In pursuing this contention, Diaz runs into strong headwinds. Perhaps most important, Diaz bore the burden of proof on this issue, pursuant to 8 U.S.C. 1229a(c)(4)(A)(i). But Diaz had actually testified under oath to the contrary before the IJ. And the IJ, in finding that Diaz had admitted to the three felony drug offenses, also found that the drug involved was cocaine. Indeed, Diaz repeatedly acknowledged to the IJ that his offenses concerned cocaine. When the IJ asked Diaz if he ever obtained, possessed, or sold *cocaine,* he responded, "only that time." *See* J.A. 120. When the IJ asked Diaz how much *cocaine* he had obtained, Diaz further responded, "[i]t was three and a half grams." *Id*. And Diaz personally knew what cocaine was, in that he had admitted using cocaine at least "once in a while." *Id.* at 122.

Contrary to this uncontradicted evidence, Diaz in these petition for review proceedings has resorted to the proposition that his testimony before the IJ was either incorrect or false. On this record, however, we are unable to accept that untenable contention. Diaz's claim that cocaine was not admittedly involved in his felony drug offenses — in view of the IJ's findings and the applicable burden of proof — serve to further undermine an effort to prove his "good moral character." *See* 8 U.S.C. § 1229b(b)(1). That contention therefore must also be rejected.

17

IV.

Pursuant to the foregoing, each of Diaz's contentions is without merit. We are thus satisfied to deny his petition for review.

*PETITION FOR REVIEW DENIED*

PAMELA HARRIS, Circuit Judge, dissenting:

As the majority opinion reaffirms, the Board of Immigration Appeals ("BIA") must follow its own precedents. *Annor v. Garland*, 95 F.4th 820, 826 (4th Cir. 2024). I do not believe the BIA decision here – which fails to enforce the agency's standard rule governing admissions to crimes or acts constituting crimes – adheres to binding BIA precedent. For that reason, I would grant the petition for review, and I must respectfully dissent from the majority's decision.

As I read *Matter of K-*, the main BIA precedent at issue, it sets out a bright-line, prophylactic rule: A noncitizen has not "valid[ly] admi[tted]" to a crime or the essential elements of that crime, under the provision now codified at 8 U.S.C. § 1182(a)(2)(A)(i), unless he has first been given "an adequate definition of the crime, including all essential elements . . . explained in understandable terms." *Matter of K-*, 7 I. & N. Dec. 594, 597 (B.I.A. 1957). The *purpose* of the rule is to ensure "fair play," *id.*, but that does not mean that its protections may be discarded if an immigration judge ("IJ") determines that under the circumstances, there is little chance that a noncitizen will be "unwittingly entrapped." *Cf.* J.A. 4, 50–51. The point of a prophylactic rule is that it applies to *all* admissions, obviating the need for such case-by-case determinations. Indeed, the BIA has described the *Matter of K-* requirement in just those terms, as a precautionary rule adopted by the agency "for the purpose of insuring that the [noncitizen] would receive fair play and to preclude any possible later claim by [the noncitizen] that he had been unwittingly entrapped into admitting the commission of a crime." *Matter of K-*, 7 I. & N. Dec. at 597.

19

That is also how the agency has understood and applied *Matter of K-*.  There is a long line of substantial agency opinions developing and laying down the *Matter of K-* rule, and not one of them says or even suggests that *Matter of K-*'s application turns on the particular circumstances under which an admission is made.  Quite the contrary.  In this case, for instance, both the BIA and the majority emphasize that Diaz was accompanied by counsel when he made his admissions.  But in a key precedential BIA opinion, the agency reaffirmed that its explanation requirement applied in just such a case, to a noncitizen's admission given in the presence of his counsel.  *See Matter of E-V-*, 5 I. & N. Dec. 194, 195–96 (B.I.A. 1953); *Matter of K-*, 7 I. & N. Dec. at 596–97.  And in both that case and another precedential decision, the agency applied its rule to admissions given, voluntarily and apparently under oath, in immigration hearings with "[p]rocedural [s]afeguards" similar to those available at Diaz's hearing.  Maj. Op. at 15; *see Matter of E-V-*, 5 I. & N. Dec. at 194–95; *Matter of G-M-*, 7 I. & N. Dec. 40, 60 (B.I.A. 1955); *Matter of K-*, 7 I. & N. Dec. at 596, 598.[*]

---

[*] Notably, the BIA retained its explanation rule even after Congress amended the statute so that a noncitizen need only admit factually to "committing acts" that constitute the essential elements of a qualifying crime, and not to the "legal conclusion" that he had "committed [a] specific crime."  *Matter of E-V-*, 5 I. & N. Dec. at 196; *accord Matter of G-M-*, 7 I. & N. Dec. at 70; *see* 8 U.S.C. § 1182(a)(2)(A)(i) (as amended).  Post-amendment, the Immigration and Naturalization Service argued to the BIA that there was no need to apply its explanation rule to an admission of *conduct* – as opposed to an admission of a crime – because there was little risk that a noncitizen describing his own conduct would be unknowingly "entrapped" into admitting an offense he had not committed.  *Matter of G-M-*, 7 I. & N. Dec. at 68–69.  But the BIA rejected that argument, reaffirming that its rule applied across the board and without an assessment of the particular risk of entrapment in a given case or set of cases.  *Id.* at 70.

20

To be sure, the key BIA precedents imposing this rule involve removability (where the agency bears the burden of proof) rather than eligibility for relief from removal (where the burden shifts to the noncitizen), and both the BIA and the majority rely in part on that distinction here. But I have trouble imagining – and more important, the agency has not explained – why that would make a difference. *Matter of K-* is intended to protect against procedural unfairness and traps for the unwary in immigration proceedings, and those concerns are as present when a noncitizen seeks relief from removal as they are when the government seeks to remove him. Nor is there any statutory hook for this distinction. The BIA drew its explanation requirement in part from a case construing the word "admits" in what is now 8 U.S.C. § 1182(a)(2)(A)(i). *See Matter of J-*, 2 I. & N. Dec. 285, 287 (B.I.A. 1945); *Howes v. Tozer*, 3 F.2d 849, 850 (1st Cir. 1925) (interpreting "admits" to require "an unequivocal acknowledgment of guilt" (internal quotation marks omitted)); *Matter of K-*, 7 I. & N. Dec. at 597. And that provision governs both removability and eligibility for cancellation of removal. *See* 8 U.S.C. §§ 1182(a)(2)(A)(i), 1229b(b)(1), 1101(f)(3).

The BIA, of course, remains free to revisit its *Matter of K-* rule. Though it has some statutory antecedents, as noted above, *Matter of K-* is not compelled by statute. *See Matter of K-*, 7 I. & N. Dec. at 597 (explaining that its explanation rule is "not based on any specific statutory requirement"). Like any prophylactic rule, *Matter of K-* will be overbroad in some of its applications, providing protection where none is necessary to serve its ends. And the majority may be right that when a noncitizen makes an admission in a formal proceeding where he is represented and accompanied by counsel, *Matter of K-*'s

21

protections are so unlikely to be needed that the cost of applying them outweighs the benefits.

But that is for the agency to decide, following proper procedures. If the BIA wants to "modif[y]" or "clarif[y]" its prior precedents, then it must issue a published decision with a majority vote of the full Board. 8 C.F.R. § 1003.1(g)(1), (3), (3)(iii). Here, we have only an unpublished BIA decision. And the agency must "provide a reasoned explanation" for its change in position – starting with an acknowledgment that there has *been* a change in position. *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018). Here, the BIA has neither recognized any departure from *Matter of K-* nor explained why one would be advisable. Instead, the agency has decided this case on the erroneous view that there is no change in position to be explained. *See id.*

That failure to follow proper procedures has costs, and they are apparent here. What used to be a straightforward bright-line rule has morphed into a fact-specific assessment of whether, under all the circumstances, a noncitizen was "unwittingly entrapped" into an admission. And because there is no authoritative BIA opinion explaining this new "all circumstances" approach, we – like the agency's judges – are without guidance on which circumstances matter, and which matter the most. Here, the majority finds that four relevant factors point in the same direction: Diaz bore the burden of proof, he was represented by counsel, his testimony was under oath, and his lawyer was present and entitled to object to the IJ's questions. Maj. Op. at 15. The IJ and BIA opinions are to the same rough effect, though they differ in their particulars. But what happens if only some and not all of those boxes can be checked? Is the *Matter of K-* explanation required for a

22

noncitizen who *is* represented by counsel but does *not* bear the burden of proof because, say, she is in removal proceedings?  What if she does bear the burden of proof but is not accompanied by counsel when she makes her admission?

The agency's decisions in this case do not answer those questions, or the many others that surely will arise under this new version of *Matter of K-*.  And prior BIA precedent cannot give us the answers, because – again – that precedent does not admit of these distinctions, and instead treats *Matter of K-* as a prophylactic, bright-line rule.  That leaves IJs and BIA judges with an unclear and unexplained rule that invites continued *ad hoc* decision-making.  If the BIA wants to reconfigure its *Matter of K-* rule, it should issue a published decision clarifying when its explanation requirement applies and providing reasoning that will allow agency judges and courts to fill in any gaps as necessary.  Or, of course, it could retain *Matter of K-*'s prophylactic rule, one of the "principal advantages" of which "is the ease and clarity of its application."  *Cf. Moran v. Burbine*, 475 U.S. 412, 425 (1986) (internal quotation marks omitted) (discussing *Miranda*'s prophylactic rule).

Just as noncitizens must "turn square corners" when they deal with the government, the government should "turn square corners" in dealing with noncitizens.  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 24 (2020).  The BIA failed to do so here when it arbitrarily side-stepped its own precedent.  *See Mouns v. Garland*, 113 F.4th 399, 414 (4th Cir. 2024).  For that reason, I dissent.